226 P.3d 231 (2010)
STATE of Washington, Respondent,
v.
Dino J. CONSTANCE, Appellant.
No. 63903-0-I.
Court of Appeals of Washington, Division 1.
March 8, 2010.
*233 Neil Martin Fox, Law Office of Neil Fox, PLLC, Seattle, WA, for Appellant.
Rachael Rogers Probstfeld, Clark County Prosecuting Attorney's Office, Vancouver, WA, for Respondent.
SCHINDLER, C.J.
¶ 1 A jury convicted Dino J. Constance of three counts of solicitation to commit murder in the first degree and one count of solicitation to commit assault in the second degree. On appeal, Constance only challenges his conviction on one count of solicitation to commit murder in the first degree, count 3. As to count 3, Constance contends the trial court erred in denying his motion to suppress evidence of the court-authorized recorded telephone conversations with Ricci Castellanos. Constance asserts that because the application for an order to intercept and record the telephone conversations relies on boilerplate justifications, it does not comply with the statutory requirement to set forth particular facts showing that "other normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ."[1] Constance also asserts the application does not support the characterization of him as a violent criminal. We hold that because the application to intercept and record the telephone conversations sets forth facts showing that other investigative procedures were tried and appeared unlikely to succeed or too dangerous to employ, and does not only rely on boilerplate justifications, the court did not err in denying the motion to suppress. We affirm the conviction of solicitation of murder as charged in count 3.

FACTS
¶ 2 Dino J. Constance and Jean Koncos married and had a child together in 2004. Constance worked as a real estate broker and Koncos worked as a massage therapist.
¶ 3 In early 2005, Koncos and Constance separated. The court designated Koncos as the primary residential parent. At the request of both parties, the court entered mutual restraining orders. Constance was arrested on February 9, and again on April 21, for violating the restraining order.
¶ 4 On February 12, 2006, Constance assaulted Koncos while attempting to abduct their two-year old son. According to the police report, Constance grabbed Koncos by the neck constricting her airway, and was "pulling her hair, choking her, and punching at her." One witness said that Constance was "dragging Koncos around by the hair outside of the vehicle and was `beating her up'" while their son was in the car crying.
¶ 5 In March, Koncos filed for dissolution of the marriage. Constance and Koncos disputed custody of their son, and the dissolution proceedings were contentious.
¶ 6 In January 2007, Constance started living with Michael Spry and his adult son Jordan Spry. According to Michael and Jordan Spry, Constance was angry and incessantly complained about Koncos and the dissolution proceedings. At first, Michael and Jordan were sympathetic to Constance. But in March, when Constance refused to pay Michael for driving to California to retrieve Constance's belongings from storage, the relationship between Constance and Michael and Jordan deteriorated. In late March, Constance moved out.
¶ 7 On March 27, Koncos called the police to report that Jordan Spry had called to tell her that Constance "wanted to hire somebody to kill" her. According to the police report:

*234 On 03/27/2007 I was dispatched to call Jean Koncos on the report of threats.
I contacted Jean by telephone since she was out of state at the time. She stated that she received a call earlier in the day from her ex-husband's ex-roommate, Jordan. He told her that Dino, her ex-husband, mentioned that he wanted to hire somebody to kill Jean. Jordan didn't mention to Jean a date, time, or method in which Dino was planning on.
Jean told me that she wasn't sure if Dino would have that done. She said that they have been fighting back and forth for awhile and dealing with a custody issue between their children. She also explained that Dino and Jordan have been fighting and Jordan is aware of the situation between Dino and Jean. She said that Jordan may be telling her Dino wants to kill her in order to help her gain custody instead of Dino.
Koncos asked the officer to contact Constance to make sure he knew that his threat to kill her had been reported to the police.
¶ 8 When the officer spoke to Constance about his alleged threat to kill Koncos, he denied telling Jordan Spry that he wanted to hire someone to kill Koncos. The police report states:
I contacted Dino by telephone. He explained the same situation between he and Jean about the custody issue. I confronted him about the information that I received. He denied making such statements to Jordan. He also told me that he and his roommate were also having issues with each other and that he had just recently moved out.
I informed Dino of the seriousness of the situation and he understood.
¶ 9 On April 5, Koncos filed a motion for an ex parte temporary restraining order against Constance. In support of the restraining order, Koncos submitted declarations from Michael Spry and Jordan Spry about the threats Constance made to kill her. The court issued a temporary restraining order and scheduled a show cause hearing for April 10. Before the hearing, Jordan told Constance that if he paid his father the money he owed, Jordan would not testify at the hearing on April 10.
¶ 10 At the show cause hearing on April 10, Koncos and Constance represented themselves pro se. Michael and Jordan Spry were the only witnesses who testified at the hearing. Michael and Jordan each testified that Constance was angry about the dissolution proceedings and talked about his plans to kill Koncos. Michael and Jordan also testified about Constance's use of alcohol and drugs, and his poor parenting skills.
¶ 11 Michael Spry testified that Constance told him "no matter what the cost, what it takes" he had to get his son away from Koncos. Michael said that Constance was constantly "filing documents for any reason, anywhere[,] at anytime, at any cost. He writes, he writes, he writes. He stays up all day, all night, thinking, working, plotting, planning, writing documents."
¶ 12 According to Michael, Constance told him that it would be "worth $5,000 to him to have somebody just make an appointment to get a massage and while they were there to just beat the very livin' s-h-blank out of" Koncos. Michael testified that Constance said "it'd be worth another $5,000 if they'd just f__in kill" Koncos. Michael said that at first, he thought it was all "locker room talk" and idle threats. But when Constance started repeatedly talking about arranging to injure or kill Koncos, whether he had been drinking or was sober and in different settings, Michael believed Constance was serious.
¶ 13 Jordan Spry testified that Constance paid him money to schedule a massage with Koncos in order to gather information to use against her in the dissolution proceedings. Jordan testified that he rescheduled massage appointments several times and did not follow through because of his concerns about Constance.
¶ 14 Jordan testified that he did not believe that the statements Constance repeatedly made that he wanted to find someone to kill Koncos were serious until Constance "came to me with a contract, he offered me $5,000 in cash to go and brutally harm" Koncos. According to Jordan, *235 Constance also said that if Jordan "would be willing to go a step further and kill you [Koncos], he would give an additional $5,000. So it was a total of $10,000 to kill" Koncos. Jordon testified that Constance made the offer to him several times, but the "offer is for anyone." Jordan said he called Koncos to warn her and told her he would testify on her behalf in court.
¶ 15 Constance cross examined Michael and Jordan Spry about the dispute over the money he owed Michael, and about Jordan's offer to not testify if Constance paid the money.
¶ 16 Constance argued that neither Michael nor Jordan Spry were credible witnesses. Constance asked the court to lift the no contact order as to his son and to not restrict visitation. The court found the testimony of Michael and Jordan Spry credible. Based on the threats to harm Koncos and Constance's excessive use of drugs and alcohol, the court prohibited Constance from having contact with Koncos and ordered supervised visitation with his son.
¶ 17 On April 13, the court found Constance in contempt for failure to pay child support. Constance was incarcerated in the Clark County jail and was housed in a jail cell with Ricci Castellanos.
¶ 18 The next day, Castellanos told jail Classification Officer Barbara Schubach that "Constance wanted to hire him to kill his wife." After Castellanos returned to his jail cell, he wrote out his recollection of the conversation with Constance.
¶ 19 Later that day, Clark County Sheriff Detectives John O'Mara and Eric O'Dell conducted a lengthy taped interview with Castellanos. Castellanos said that Constance told him, "`I need somebody to killkill mymy ex.'" Constance told Castellanos that his wife is 5'10", works as a masseuse, advertises on craigslist, and lives in a four-plex apartment off Mill Plain Boulevard. Constance said that he loves his son but was only allowed supervised visitation, and "he will do anything in this world to get that child." Castellanos said that he told Constance "`[w]ell I could have it done.'" When Constance asked, "`[h]ow much. How much would you charge?' [Castellanos] said, `around $15,-000.00.'" When Constance said, "`[w]ell, that's too much money....' `I was looking more about three to five thousand,'" Castellanos told Constance that he could probably "get it done for about $5000," and Constance agreed to pay Castellanos "$2500 up front."
You know, if there's two ... two of us, I said, `I'm going to get mine, and these other guys are going to want theirs.' I go, `You said she's 5'10", right? So, she's got to be a big lady. It's hard for one guy, you know, to do that.' I said, `I'll' `They can have all the money upfront, and then I can take my cut at the end. But you've got to make sure that the money is there. I've got to have the money.' And he said, `Okay. The money will be there. The money will be there.' When I call you.
. . .
He mentioned that he's a mortgage broker, and that he's got ... we've got firms out there, you know, things that he sells. I don't know what mortgage brokers do. You know, I never bought a house or anything else like that, but I'm sure it's into real estate or something like that. But he said he's got ... he's got ways to get. You know, that $11,000.00 that he's supposed to get, he thinks that that company is going to lose, but he's got other ways to get it. That's why he said three weeks. You know, `Give me three weeks. I will have your $2,500.00.'
. . .
It's a $5,000.00 deal....
. . .
$2,500.00 would be paid upfront. And he would put it in an envelope at a specified location, and he would call me with the code name, you know.
Castellanos told the detectives that Constance then talked to Castellanos about the plan to kill his spouse.
And then he would say thatthat's when he was talking about how to kill her. `How you going to do this, Ric?' `How you going to' `how you going to' `What? Is there going to be two of them? Is there going to be one of them[?]' And I said, `Well, there was going to be two of them.'

*236 . . .
And he said, `Great. This is the best. This is what I want.' And then he proceeded to tell me about how it would be easier, because he owns a boat, that we could just knock her out, put her body on there, you know, he kept saying different ways about ... about knocking her out. You know, clubbing her. Clubbing her. We could hit her head on the wall, because a lot of people drown ... drown in their... in their bathtubs a lot, you know, by just slipping and falling and drowning in the bathtub. Said we could go blow dry her in the tub. You know, things like that.
. . .
And I said, `[w]ell, whatever.' I said, `We've got to do this right, though. If we're going to do it, we've got to do it right.' Then, he mentioned about moving her tojust getting a house, like, for sale. There's a house for sale or something like that. And just make sure, you know, have her come out. She's there, you know, you're going to get a massage and stuff like that, because she's a massage therapist. That make an appointment for her to come to this certain house, and then just have her go in the backyard, you know, club her and stuff like that.
¶ 20 According to Castellanos, he and Constance planned to meet in a couple weeks. Constance insisted they use pay telephones and code names. Constance planned to use the name "Tim" and Castellanos said he would use the name "DeWayne." Constance gave Castellanos a cell phone number to use to call him.
¶ 21 Castellanos told the detectives that Constance was angry and his demeanor was very aggressive. Castellanos also believed Constance was serious because "he's asked his roommates to go and do this for him ... [k]ill his wife and stuff like that."
¶ 22 Castellanos agreed to work with the detectives and gave the detectives permission to record the telephone conversations. The plan was to contact Constance and attempt to get him to meet with a detective posing as a "hit man." In exchange for his cooperation, Castellanos sought a modification of the terms of his supervision.
¶ 23 On April 20, Detective Bryan Acee submitted an application for an order authorizing the interception and recording of communications to a superior court judge. The sworn twelve-page application sets forth a detailed statement of probable cause alleging that Constance "has committed, and will further commit, the felony crime of Criminal Solicitation to commit Murder in the First Degree." The application describes the testimony of Michael and Jordan Spry at the April 10 court hearing, Officer Schubach's report of the statements Castellanos made to her, the taped interview the detectives had with Castellanos, and the contemporaneous notes Castellanos made of his conversation with Constance while in jail. The application attaches as exhibits a recording of the April 10 hearing, Officer Schubach's report, a ten-page transcript of the detectives' interview of Castellanos, and a number of police reports related to violations of the restraining orders and incidents of domestic violence between Constance and Koncos. The application also sets forth the criminal history of Constance and Castellanos.
¶ 24 The application states that Castellanos used the agreed code name and called Constance on his cell phone on April 18, leaving a message for "Tim" to call "DeWayne." The application says Castellanos returned the call on April 19 and that Constance "yelled at him because Constance expected" Castellanos to call him sooner. Constance told Castellanos that he was "bogged down with court" and would call him after a court hearing on April 20.
¶ 25 The application says that the detectives contacted Koncos and verified that the information Constance gave Castellanos was accurateshe is approximately 5'10" tall, works as a massage therapist, advertises on craigslist, and lives in a four-plex off Mill Plain Boulevard. Koncos also told the detectives she "was afraid of Constance and believed him capable of killing heror having her killed."[2]
*237 ¶ 26 The application describes in detail the proposed "Operational Plan" to have Castellanos arrange a meeting with undercover Detective John Hess, posing as a professional "hit-man" who was willing to murder Constance's ex-wife for $5,000. The application also describes the plan to intercept and record the conversations, the duration of the investigation, and the need to record the conversations. The application explains why normal investigative techniques likely would not succeed because of the nature of the crime, the need for independent verification of statements to prove solicitation to commit murder, and the need to monitor the safety of Detective Hess.[3]
¶ 27 The court found probable cause to believe Constance "has committed, and will further commit the felony crime of Criminal Solicitation to Commit Murder in the First Degree" of Koncos and that "[n]ormal investigative techniques reasonably appear to be unlikely to succeed if tried and reasonably appear to be too dangerous to employ." The court entered an "Order Authorizing Interception and Recording of Communications or Conversations Pursuant to RCW 9.73.090" for seven days, or until April 27.
¶ 28 On May 1, Detective John O'Mara submitted a second application for authority to intercept and record communications between Constance and Castellanos and/or Detective Hess for an additional seven days. The application incorporates by reference the information previously provided in the first application.[4]
¶ 29 In the application, Detective O'Mara states that during a telephone conversation between Constance and Castellanos on April 20, Constance said that because of the family court proceedings, "things are `too hot now.'" Constance told Castellanos to "call him back in about one and one half weeks to set up the meeting in order to `get this done.'" The court entered an order authorizing the police to intercept and record communications or conversations between Constance and/or Castellanos and Hess for an additional seven days.
*238 ¶ 30 The police intercepted and recorded telephone calls between Castellanos and Constance on May 1 and May 7. In the first May 1 call, Constance identifies himself as "Tim," and after verifying that "DeWayne" is calling him from a pay phone, Constance tells Castellanos he wants to talk to him later that day. In the second call on May 1, Castellanos tells Constance that a friend of his is interested. In response, Constance says he needs to wait at least a week.
¶ 31 In the telephone call on May 7, Constance gives Castellanos Koncos's telephone number and instructs Castellanos about how to go about scheduling a massage appointment with her. Constance tells Castellanos to call Koncos using a pay phone, but to make sure to use "*67" so Koncos would not know he is using a pay phone. Constance instructs Castellanos to get a haircut and grow a beard. Constance also tells Castellanos what he should say to avoid suspicion, emphasizing that "this has to be done right or you're gonna get busted." When Castellanos asks Constance "[w]e still want her dead, right?" Constance responds, "[w]e don't want to talk about things like that on the telephone." Constance then tells Castellanos how to avoid leaving fingerprints and "how to get away with this." Constance says he will leave Castellanos the money and when he is scheduled to be out of town "we will get this done." After listening to the conversation on May 7, the police arrested Constance.
¶ 32 After his arrest, the police learned that in March 2007, Constance solicited former cellmate Zachary Brown to assault Koncos. Brown testified that Constance asked him to do a "one-time job" for $1000. Brown said Constance deposited money in Brown's jail commissary account to show that he was serious. According to Brown, Constance wanted him to beat up Koncos. Consistent with the instructions that Constance later gave Castellanos, Constance told Brown to grow a beard and how to schedule an appointment with Koncos.
Q: All right. And what was the job?
A: He wanted me to schedule an appointment with his wife, fiancée, baby's mom, I don't know what she was to him. Obviously the baby, thethe baby's mother.
Q: Okay.
A: He wanted me to schedule an appointment with her on Craig's List. He told me that she was a massage therapist on Craig's List.
He wanted me to schedule an appointment, go in, grow my facial and the hair on my head out to where it couldn't be recognized, so a disguise.
He wanted me to go in, beat her up, rob her, bust her teeth out, make her bleed, and then leave.
And upon the completion of the job, give him a call and he'd give me the remainder of the money.
Q: Okay. Did he say how he wanted you to initiate contact with him?
A: Yes. He said only calling from a pay phone, no land lines, he just didn't want any land lines, he said just a pay phone.
¶ 33 The State charged Constance with three counts of solicitation to commit murder of Koncos in the first degree, count 1 as to Michael Spry, count 2 as to Jordan Spry, and count 3 as to Castellanos. The State charged Constance in count 4 with solicitation of Brown to commit assault in the second degree of Koncos.
¶ 34 Constance filed a motion to suppress the recorded telephone conversations. Constance argued that the application to intercept and record the conversations did not comply with the statutory requirement to set forth the particular facts to explain why other investigative techniques were not considered or used. The court rejected Constance's argument and denied the motion to suppress.
The information indicates that Mr. Constance was alleged to have contacted some individuals to solicit a serious violent crime and that when confronted about that that he indicated that not only denied that that had occurred but also denied that or indicated that the people who were accusing him had problems, that they had motive, reasons to be lying about him.
Then another person comes in and says, he solicited me on a separate occasion, and the person that's making this report is *239 someone[]s whose veracity could also be challenged.
And so the police considered whether it would be a good idea to just simply go with a hesaid, hesaid sort of a thing or whether there should be some way to try to independently verify whether any of the three people accusing Mr. Constance were, in fact, telling the truth, and they perceived that the best way to do that or one way to do that would be to conduct an investigation where they didn't have to rely on the word of any of the accusers, that one of the accusers could make a contact with Mr. Constance and Mr. Constance would either make additional incriminating statements that could be verified by third parties or would not make such statements, which perhaps would indicate that the three people were, including Mr. Castellanos, were not telling the truth.
That's a perfectly acceptable way to proceed.
And that there was certainly danger involved other than the danger that's inherent in all undercover investigations. This is not a situation where the police said, Well, every time there's an undercover investigation we should be allowed to record or transmit. They indicated because Mr. Constance's past allegations of violent behavior and the fact that they were investigating a crime which indicated he was trying to solicit other people to commit violent acts, that there was more than the normal danger involved.
¶ 35 A number of witnesses testified at trial on behalf of the State, including Detective O'Mara, Detective Hess, Officer Schubach, Michael Spry, Jordan Spry, Koncos, Castellanos and Brown. The recorded telephone conversations between Constance and Castellanos were admitted into evidence and played for the jury.
¶ 36 The defense argued that Michael Spry, Jordan Spry, Castellanos, and Brown were not credible. The defense also claimed that when Constance is mad, he is prone to say things that he does not mean. Constance's sister testified that Constance has a tendency to exaggerate. Constance did not testify.
¶ 37 The jury convicted Constance as charged of three counts of solicitation to commit murder in the first degree and one count of solicitation to commit assault in the second degree. Constance only appeals the conviction of solicitation of Castellanos to commit murder in the first degree, count 3.

ANALYSIS
¶ 38 Constance contends the court erred in denying his motion to suppress the recorded telephone conversations with Castellanos. Constance asserts that because the application to intercept and record the conversations contains "boilerplate" justifications, the application does not comply with the mandatory requirement under RCW 9.73.130(3)(f) to set forth particular facts showing that other normal investigative procedures were tried, appear unlikely to succeed, or were too dangerous to employ.
¶ 39 Washington's privacy act, chapter 9.73 RCW, prohibits the interception and recording of private communications and conversations without the consent of all parties. RCW 9.73.030(1)(a) provides in pertinent part:
Except as otherwise provided in this chapter, it shall be unlawful ... to intercept or record ... [p]rivate communication transmitted by telephone ... between two or more individuals ... without first obtaining the consent of all the participants in the communication.
¶ 40 Information obtained in violation of RCW 9.73.030 is inadmissible. Under RCW 9.73.050,
[a]ny information obtained in violation of RCW 9.73.030 or pursuant to any order issued under the provisions of RCW 9.73.040 shall be inadmissible in any civil or criminal case in all courts of general or limited jurisdiction in this state....
¶ 41 RCW 9.73.090 sets forth a number of exceptions to the prohibition against the interception and recording and the admission of communications. RCW 9.73.090(2) allows the police to intercept and record communications if one party consents, there is probable *240 cause that the nonconsenting party "has committed, is engaged in, or is about to commit a felony," and a judge authorizes interception and recording. RCW 9.73.090 provides in pertinent part:
The provisions of RCW 9.73.030 through 9.73.080 shall not apply to police, fire, emergency medical service, emergency communication center, and poison center personnel in the following instances: (3)27
¶ 42 (2) It shall not be unlawful for a law enforcement officer acting in the performance of the officer's official duties to intercept, record, or disclose an oral communication or conversation where the officer is a party to the communication or conversation or one of the parties to the communication or conversation has given prior consent to the interception, recording, or disclosure: PROVIDED, That prior to the interception, transmission, or recording the officer shall obtain written or telephonic authorization from a judge or magistrate, who shall approve the interception, recording, or disclosure of communications or conversations with a nonconsenting party for a reasonable and specified period of time, if there is probable cause to believe that the nonconsenting party has committed, is engaged in, or is about to commit a felony....
¶ 43 (3) Communications or conversations authorized to be intercepted, recorded, or disclosed by this section shall not be inadmissible under RCW 9.73.050.
¶ 44 The application for court approval to intercept and record communications under RCW 9.73.090(2) must meet the requirements of RCW 9.73.130. Under RCW 9.73.130, the application must contain a "particular statement of the facts" justifying interception and recording, including a statement of probable cause, detailed information concerning the offense, the necessity to intercept and record, and facts showing that other investigative procedures have been tried, are unlikely to succeed, or are too dangerous to employ. RCW 9.73.130 provides in pertinent part:
Recording private communicationsAuthorizationApplication for, contents.
Each application for an authorization to record communications or conversations pursuant to RCW 9.73.090 as now or hereafter amended shall be made in writing upon oath or affirmation and shall state:
(1) The authority of the applicant to make such application;
(2) The identity and qualifications of the investigative or law enforcement officers or agency for whom the authority to record a communication or conversation is sought and the identity of whoever authorized the application;
(3) A particular statement of the facts relied upon by the applicant to justify his belief that an authorization should be issued, including:
(a) The identity of the particular person, if known, committing the offense and whose communications or conversations are to be recorded;
(b) The details as to the particular offense that has been, is being, or is about to be committed;
(c) The particular type of communication or conversation to be recorded and a showing that there is probable cause to believe such communication will be communicated on the wire communication facility involved or at the particular place where the oral communication is to be recorded;
(d) The character and location of the particular wire communication facilities involved or the particular place where the oral communication is to be recorded;
(e) A statement of the period of time for which the recording is required to be maintained, if the character of the investigation is such that the authorization for recording should not automatically terminate when the described type of communication or conversation has been first obtained, a particular statement of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;
(f) A particular statement of facts showing that other normal investigative procedures with respect to the offense have been tried and have failed or reasonably *241 appear to be unlikely to succeed if tried or to be too dangerous to employ.
¶ 45 Relying on State v. Manning, 81 Wash.App. 714, 718, 915 P.2d 1162 (1996), Constance argues that because the application uses boilerplate justifications, it violates the requirement of RCW 9.73.130(3)(f) to provide a particular statement of facts showing that other normal investigative procedures were tried or appear reasonably unlikely to succeed.
¶ 46 We review the court's decision authorizing the interception and recording of communications to determine whether the facts set forth in the application "are minimally adequate" to support the court order. State v. Johnson, 125 Wash.App. 443, 455, 105 P.3d 85 (2005). RCW 9.73.130(3)(f) requires "something less than a showing of absolute necessity to record to acquire or preserve evidence." State v. Platz, 33 Wash.App. 345, 349, 655 P.2d 710 (1982). In determining whether to authorize the interception and recording of communications, the judge "has considerable discretion to determine whether the statutory safeguards have been satisfied." Johnson, 125 Wash.App. at 455, 105 P.3d 85.
¶ 47 Manning does not support the premise of Constance's argument that if an application contains boilerplate justifications, the decision to authorize interception and recording of communications under RCW 9.73.090, violates the requirements of RCW 9.73.130(3)(f).
¶ 48 In Manning, the court authorized the police to intercept and record conversations between a confidential informant and a suspected drug dealer. Manning, 81 Wash.App. at 717, 915 P.2d 1162. The application to intercept and record relied on a number of justifications including:
The anticipated conversations were of primary importance to the investigation. Interception and recording would avoid a `one-on-one swearing contest as to who said what, provide uncontroverted evidence of Manning's criminal intent, minimize factual confusion, and rebut anticipated allegations of entrapment.' The application stated, `[n]o more reliable evidence of the communications or conversations is available than a recording, or recordings, of the actual conversations. The spoken words are themselves the best evidence of criminal intent. No other investigative method is capable of capturing these words in such clear and admissible evidentiary form.' In further justification, the application averred it was necessary `to intercept and record conversations at the earliest stage of case development to maintain the integrity and proper direction of the investigator.'
Manning, 81 Wash.App. at 720, 915 P.2d 1162.
¶ 49 We decided that the justifications in Manning were contrary to the statutory mandate to provide a particular statement of facts, and "appear to have become boilerplate in applications under the Privacy Act," contrary to the requirement under RCW 9.73.130(f). Manning, 81 Wash.App. at 720, 915 P.2d 1162. We held that an application to intercept and record communications cannot rely on boilerplate justifications alone, and emphasized that the critical inquiry is to determine whether the application shows that the police gave "serious consideration to other methods" and explain why those methods are inadequate. Manning, 81 Wash.App. at 720, 915 P.2d 1162.
Boilerplate is antithetical to the statute's particularity requirement set forth in RCW 9.73.130(3)(f). The requirement for a `particular statement of facts' reflects the Legislature's desire to allow electronic surveillance under certain circumstances but not to endorse it as routine procedure. Before resorting to an application under RCW 9.73.130, the police must either try, or give serious consideration to, other methods and explain to the issuing judge why those other methods are inadequate in the particular case. [Footnote omitted] This is the critical inquiry to which the issuing judge and the trial judge must give their attention when reviewing an application.
Manning, 81 Wash.App. at 720, 915 P.2d 1162. Consequently, an application that contains "nothing more than general boilerplate" undermines and violates the intent and the language of RCW 9.73.130(3)(f) to set forth *242 particular facts showing normal investigative methods were tried or appear unlikely to succeed. Manning, 81 Wash.App. at 721, 915 P.2d 1162.
¶ 50 Nonetheless, we concluded that the application in Manning was "minimally adequate" because it contained more than general boilerplate justifications. The application stated that the defendant was the target of a previous inconclusive investigation, was known to be armed and dangerous, and that using an undercover officer without the protection of a transmitter would be unlikely to succeed because of the risk to the officer. Manning, 81 Wash.App. at 721-22, 915 P.2d 1162.
¶ 51 Here, Constance argues that the application violates RCW 9.73.130(3)(f) because it only relies on boilerplate justifications and does not set forth particular facts showing that other investigative procedures were tried or appear "unlikely to succeed if tried or to be too dangerous to employ." In support of his argument, Constance points to statements in the application that are similar to the boilerplate justifications criticized in Manningthat a recording was the best way to verify the conversation, that recorded conversations were critical to later evaluation of the witnesses, that a recording would avoid "a one-on-one swearing contest" and would rebut an entrapment defense, along with the stated need to monitor the safety of the undercover officer.
¶ 52 Contrary to Constance's argument, the decision in Manning does not prohibit the use of boilerplate language altogether. Here, as in Manning, the application does not rely only on general boilerplate justifications to show that the police gave serious consideration to other normal investigative techniques. The application explains why normal investigative methods were inadequate and unlikely to succeed or too dangerous to employ. The application states in pertinent part:
Normal investigative techniques are unlikely to succeed if tried and are too dangerous to try. Castellanos was in contact with Constance as the two shared a jail cell over the weekend. Outside the above described investigative operation, involving the murder of Constance's ex-wife, Constance has not requested to meet Castellanos' `hit man.' The idea of arresting Constance in hopes he will admit his intent to hire a hit-man to murder his ex-wife is unlikely. Even if Constance did divulge his desire to have his ex-wife murdered, that alone may not support his prosecution for Solicitation to Commit Murder in the First Degree and Criminal Conspiracy. In the meantime, as Constance has demonstrated, he may be soliciting other individuals to murder his ex-wife. I believe time is of the essence, as Constance is out of jail and may be soliciting another person, or persons, to murder his wife. The statements made by Castellanos and the sworn testify made under oath by Jordon and Michael Spry support my belief.
The application also describes the unsuccessful previous attempt to question Constance about the threat to kill Koncos that he made to Jordan Spry. When the police asked Constance about the reported threat to kill Koncos, he flatly denied making any such threat.
¶ 53 Moreover, in deciding whether to authorize interception and recording, the court must take into account the nature of the crime and the inherent difficulties in proving the crime. State v. Kichinko, 26 Wash.App. 304, 311, 613 P.2d 792 (1980); State v. Lopez, 70 Wash.App. 259, 267, 856 P.2d 390 (1993). Interception and recording is appropriate if proof of knowledge is an element of the crime. State v. Porter, 98 Wash.App. 631, 636, 990 P.2d 460 (1999).
¶ 54 Here, as the application correctly states, the crime of solicitation to commit murder in the first degree requires proof of intent.
[I]ndependent verification of his statements is necessary to help prove he was solicited. A recording of statements between Castellanos and Constance will be the best way to verify Castellanos['] statements.
Further, because of the nature of the crime, a recording of all of the conversations is appropriate and helpful to prove that the scheme originates in the mind of *243 Constance and that he is not entrapped into committing the crime.
¶ 55 Solicitation to commit murder is an anticipatory offense that requires proof of a person's "intent to promote or facilitate" a crime. State v. Varnell, 162 Wash.2d 165, 169, 170 P.3d 24 (2007); RCW 9A.28.030(1). A person is guilty of the offense without regard to whether the criminal act is completed. Varnell, 162 Wash.2d at 169, 170 P.3d 24. RCW 9A.28.030(1) requires only that the solicitation occursthat a person offers money or something of value to another person to commit a crime. Varnell, 162 Wash.2d at 169, 170 P.3d 24.
¶ 56 The application also explains the need to monitor the undercover officer for safety reasons. "It would be unsafe for Detective Hess to meet with Constance without audio and video capability so that `other investigators can monitor the meetings and ensure the ability to respond quickly if anything goes wrong.'" The application states that because the undercover officer would not always be in close proximity to the police protection teams, "[t]he only way to monitor the safety of the officer is through the use of transmitted conversation."
¶ 57 We conclude the application sets forth facts that are more than adequate to meet the statutory requirements and support the court's determination that "normal investigative procedures with respect to the offense have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ." RCW 9.73.130(3)(f).
¶ 58 Constance also argues that the police reports submitted with the application do not support the characterization of him as a violent criminal. The application states:
[T]he investigative plan described above, if successful, is anticipated to result in the arrest and prosecution of a habitual domestic violence offender and violent excon....
Constance's interactions with his ex-wife and his criminal history show him to be an active and elusive criminal who has been engaged in criminal activity for quite some time. He is therefore not likely to speak about his criminal activity or to participate in the planned murder of his ex-wife if he thinks non-participant witnesses are in a position to overhear his conversations.
¶ 59 The police reports indicate that Constance was a suspect in a number of domestic violence assaults and violated the protection order against Koncos eleven times over the previous three years. While Constance contends that many of these incidents were minor or were instigated by Koncos, he ignores the most recent police reports describing the failed attempt to abduct his son and the violent assault of Koncos, and the threat to kill her.
¶ 60 Because the application to intercept and record the communications between Constance and Castellanos meets the requirements of RCW 9.73.130, the court did not err in denying the motion to suppress. We affirm the conviction of solicitation to commit murder in the first degree as charged in count 3.[5]
WE CONCUR: LEACH and ELLINGTON, JJ.
NOTES
[1] RCW 9.73.130(3)(f).
[2] The Clark County Sheriff's Office made arrangements to relocate Koncos.
[3] "Normal investigative techniques are unlikely to succeed if tried and are too dangerous to try. Castellanos was in contact with Constance as the two shared a jail cell over the weekend. Outside the above described investigative operation, involving the murder of Constance's ex-wife, Constance has not requested to meet Castellanos' `hit-man'. The idea of arresting Constance in hopes he will admit his intent to hire a hit-man to murder his ex-wife is unlikely. Even if Constance did divulge his desire to have his ex-wife murdered, that alone may not support his prosecution for Solicitation to Commit Murder in the First Degree and Criminal Conspiracy. In the meantime, as Constance has demonstrated, he may be soliciting other individuals to murder his ex-wife. I believe time is of the essence, as Constance is out of jail and may be soliciting another person or persons, to murder his wife. The statements made by Castellanos and the sworn testimony made under oath by Jordan and Michael Spry support my belief. Additionally, Constance has demonstrated a propensity toward violence, as detailed in the many police reports attached herein (Exhibit No. 5).

"An additional, but significant problem occurs with Castellanos' testimony. His felony criminal history is of a nature that they will be disclosed to a jury during any trial. Although his information corresponds with the statements of Jordan and Michael Spry, who testified in court that Constance tried to hire them to kill Koncus [sic], any solicitation of Castellanos is a separate crime. Because of the nature of Castellanos' criminal background, independent verification of his statements is necessary to help prove he was solicited. A recording of statements between Castellanos and Constance will be the best way to verify Castellanos['] statements.
Further, because of the nature of the crime, a recording of all of the conversations is appropriate and helpful to prove that the scheme originates in the mind of Constance and that he is not entrapped into committing the crime. Given Castellanos['] background and potential issues with his criminal history being placed in front of a jury, a recording will be the best way to ensure that he has not overstepped his role and entrapped Constance."
[4] RCW 9.73.130 provides in pertinent part:

(4) Where the application is for the renewal or extension of an authorization, a particular statement of facts showing the results thus far obtained from the recording, or a reasonable explanation of the failure to obtain such results;
(5) A complete statement of the facts concerning all previous applications, known to the individual authorizing and to the individual making the application, made to any court for authorization to record a wire or oral communication involving any of the same facilities or places specified in the application or involving any person whose communication is to be intercepted, and the action taken by the court on each application; and
(6) Such additional testimony or documentary evidence in support of the application as the judge may require.
[5] We deny Constance's request to consider the information he submitted in support of his CrR 7.8 motion for relief from judgment without prejudice to his right to pursue post conviction relief. State v. McFarland, 127 Wash.2d 322, 338, 899 P.2d 1251 (1995). We also conclude that the other arguments raised in his statement of additional grounds are without merit.