2015 MAR -9 AM 9: 20


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 71155-5-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| RYAN DAVID FIROVED, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: March 9, 2015 |
| | ) | |

LAU, J. — A decision authorizing the interception and recording of private communications under the state privacy act, chapter 9.73 RCW, will be upheld if the facts asserted in the application for such authorization are minimally adequate to support the court's determination. Because the facts asserted in the application at issue in this case were adequate to support the recording of Ryan Firoved's telephone conversations, we affirm the trial court's order denying his motion to suppress the recordings. And because Firoved's other claim on appeal lacks merit, we affirm his conviction for first degree attempted rape of a child.

## FACTS

On June 25, 2012, KP called the Kirkland Police Department and alleged that her boyfriend, Ryan Firoved, had expressed interest in having sex with her nine-year-old

daughter. In July 2012, Detective Allan O'Neill filed an application in superior court seeking authority to intercept and record telephone conversations between KP and Firoved. The application included the following facts:

Several months before KP called the police, Firoved started telling her about his interest in, and prior sexual acts with, young girls. He said he had intercourse several years earlier with his friend's 12-year-old sister. He also said he had watched his 8-year-old daughter masturbate numerous times and that he masturbated while watching her. He wanted "to touch her and pleasure [her] correctly but she was only eight and they need to be 10-years-old." He said that he likes to watch father and daughter pornography, which "he would like it better if it was real instead of made up and that he would have sex with his daughter.

On June 10, 2012, Firoved texted KP and said he had been a "bad uncle." KP texted back, asking why he was bad. Firoved replied that he had watched his niece masturbating. He refused to reveal his niece's age by text but then telephoned KP and said his niece was 14. He then recounted in detail how he and his niece performed oral sex on each other. He also said, "[I] was thinking about [your] daughter's 'little tight pussy.'"

A week later, Firoved and KP were having sex when Firoved asked if he could "'have her daughter.'" Firoved said he wanted KP to watch while he had sex with her daughter. He added that both of their daughters could watch or participate while he and KP had intercourse. According to KP, Firoved has said "that he loves taking girls' virginities."

On June 25, 2012, KP texted Firoved and said she did not like him "'wanting her kid'" and wanting to "'lick'" her daughter. Firoved responded, "'I don't know what you are talking about.'"

On June 26, 2012, the day after she first contacted police, KP texted Firoved, "'So, what's the verdict?'" Firoved replied, "'I am looking at this way [i]f you want to be with me you will submit I in charge what says goes.'" KP responded with "'Lol . . . ok.'" Firoved replied, "'I am serious anything I says go.'" Later that day, Firoved texted KP about "'what you asked earlier.'" KP replied, "'[W]ould you honestly be up for it?'" Firoved texted, "'Yes'" and "'That would be hot.'" KP texted back, "'[W]hat would you wanna do the most?'" Firoved replied, "'Mmmm lick.'" KP asked, "'What if she started to resist?'" Firoved replied, "'Told you I would stop.'" They then discussed when they could meet for Firoved to have sex with KP's daughter.

On June 27, 2012, KP called Detective O'Neill and said that Firoved called her that morning to set up a time to meet her and her daughter. Firoved said he wanted to lick her daughter and put his fingers inside her to see if he could have sex with her.

On July 2, 2012, KP received another call from Firoved about meeting her and her daughter. KP asked if he really wanted "to have sex with her daughter." Firoved said, "[Y]es, [I do]." That afternoon, Firoved called again to say he was available to meet anytime that week. KP believed that Firoved would meet her at a motel with the intent of having oral sex and/or intercourse with her daughter.

KP told police that "Firoved talks freely over the telephone about wanting to have oral sex with her daughter, and to digitally penetrate her daughter's vagina." She said Firoved would have partial conversations about these topics while texting, but would

"usually tell her to call him and he then discusses . . . his past sex crimes or his plans, hopes, and desire to commit future felony crimes of rape of a child."

The application also described a 2011 undercover investigation involving Firoved. In that case, Firoved answered an undercover detective's online advertisement indicating that a young girl was looking for older men to teach her sex. Following a series of e-mails and a meeting at which Firoved agreed to meet the undercover detective's fictitious 13-year-old daughter at a hotel, Firoved eventually stopped communicating.

On July 3, 2012, the superior court granted Detective O'Neil's application for intercept authorization. That same day, KP recorded a telephone conversation with Firoved. They discussed meeting at a hotel so that Firoved could have oral sex with KP's daughter. Firoved was concerned that the police might be listening and resisted stating exactly what he planned to do. He confirmed, however, that he would "be there Thursday" and that he was 100 percent sure that he would perform oral sex on KP's daughter if KP was there to be his "partner in crime." Ex. 23 at 28.

In a second recorded telephone call, Firoved stated, "I want to have oral sex with [KP's daughter]." Ex. 25 at 5. He and KP then agreed to meet at a hotel the next Thursday. Police arrested Firoved when he arrived at the hotel.

The State charged Firoved with first degree attempted rape of a child. Prior to trial, he moved to suppress the recorded telephone conversations. He argued that the application for intercept and recording authorization failed to comply with the requirements of the Washington privacy act, chapter 9.73 RCW. The trial court denied the motion, stating in part:

I think that the application here does comply with RCW 9.73.130 in that I think it shows that normal investigative procedures would -- do not appear likely to succeed.

I think that in this case it's critical that you have Mr. Firoved's voice actually in an actual phone call as opposed to just text messages. There's no way, from a text message, to judge whether he's joking around, whether he's serious, what the whole context of the discussion is. And that it was -- the application for the warrant makes the appropriate showing under the statute as to why it's necessary to have the intercept that was done here.

Report of Proceedings (Sept. 30, 2013) at 64 (emphasis added).

The case proceeded to trial, and a jury found Firoved guilty as charged. He appeals.

DECISION

Firoved first contends the trial court erred in denying his motion to suppress the recordings of his telephone conversations with KP. He claims the recordings were inadmissible because the application for their authorization was insufficient under the privacy act, chapter 9.73 RCW. Specifically, he contends the application "failed to justify why [the] voluminous text messages" between Firoved and KP "were not sufficient and why oral communication was sought." Appellant's Br. at 8. We disagree.

An application to intercept and record communications must meet the requirements of RCW 9.73.130. Subsection (3) of the statute requires a "particular statement of the facts" justifying interception and recording, including a statement of probable cause, detailed information concerning the offense, the necessity to intercept and record, and facts showing that other investigative procedures have been tried, are unlikely to succeed, or are too dangerous to employ.[1] A judge authorizing such

---

[1] RCW 9.73.130 provides in part that each application for recording authorization shall include:

      (3) A particular statement of the facts relied upon by the applicant to justify his or her belief that an authorization should be issued, including:

recordings has broad discretion to determine whether this statute has been satisfied, and we will affirm if the facts set forth in the application are minimally adequate to support the court's determination. State v. Constance, 154 Wn. App. 861, 880, 226 P.3d 231 (2010). We review de novo a trial court's legal conclusions on a motion to suppress. State v. Roden, 179 Wn.2d 893, 898, 321 P.3d 1183 (2014).

Contrary to Firoved's assertions, Detective O'Neil's application asserted facts justifying the telephonic recordings. The application recounted specific instances where Firoved refused to give incriminating details in his text messages, choosing instead to convey those details over the telephone. The application also made this point in more general terms, stating:

> Firoved has both explicitly said and, in other text messages to [KP], implied that he does not want to be too specific in the texts.
>
> . . . .
>
> . . . [KP] stated that Firoved talks freely over the telephone about wanting to have oral sex with her daughter, and to digitally penetrate her daughter's vagina. She said he has sent her text messages with partial conversations about

---

(a) The identity of the particular person, if known, committing the offense and whose communications or conversations are to be recorded;

(b) The details as to the particular offense that has been, is being, or is about to be committed;

(c) The particular type of communication or conversation to be recorded and a showing that there is probable cause to believe such communication will be communicated on the wire communication facility involved or at the particular place where the oral communication is to be recorded;

(d) The character and location of the particular wire communication facilities involved or the particular place where the oral communication is to be recorded;

(e) A statement of the period of time for which the recording is required to be maintained, if the character of the investigation is such that the authorization for recording should not automatically terminate when the described type of communication or conversation has been first obtained, a particular statement of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;

(f) A particular statement of facts showing that other normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ.

having sex with her . . . daughter. [KP] said that Firoved will usually tell her to call him and he then discusses with [KP] his past sex crimes or his plans, hopes, and desire to commit future felony crimes of rape of a child.

The application also pointed out that the nature of anticipatory offenses often requires a recording to firmly establish the defendant's intent:

Conspiracy to commit Rape of a Child is a verbal crime, generally proven exclusively upon the words spoken by the suspect and suspect's intent[,] as expressed in those words, to promote or facilitate the commission of intended felony crimes . . . . The actual content, tone, inflection, speech patterns, and volume of the suspect's and cooperating witnesses' own voices, as well as the context of the suspect's statements, because they convey meaning outside that contained in the spoken words themselves, will be critical to a determination of the suspect's actual plan and intentions regarding the above-described crimes. Only the suspect's own words will provide adequate evidence of the suspect's mental state as the suspect discusses the above-described crimes with the cooperating witness and discusses the prior events and/or conversations that motivate the suspect to plan the described crimes. The delivery is at least as important as the words themselves in determining whether the suspect genuinely intends to commit the felony crimes that were first suggested and requested by the suspect. This can never be adequately conveyed by testimony about the conversation. . . .
 Due to the nature of the crimes that the suspect has requested be committed, it is unlikely there will be physical or documentary evidence which, standing alone, will significantly link the suspect to conspiracy.

We have previously held that "in deciding whether to authorize interception and recording, the court must take into account the nature of the crime and inherent difficulties in proving the crime." Constance, 154 Wn. App. at 883. Here, the crime under investigation—conspiracy to commit rape—required proof that Firoved, "with intent that conduct constituting [rape] be performed," agreed "to engage in or cause the performance of such conduct" and took a substantial step toward performance of that agreement. RCW 9A.28.040(1). The recordings helped prove that Firoved had the requisite intent.

The application also alleged that other methods of obtaining the necessary evidence had been tried or were unlikely to succeed and that the text messages alone would not make a sufficiently strong case against Firoved:

Normal investigative techniques have been tried and failed, reasonably appear to be unlikely to succeed if tried, and reasonably appear to be too dangerous to employ.

. . . .

. . . Pairing the cooperating witness with an undercover detective, or introducing an undercover detective to replace [KP] would likely erode . . . trust [with KP] and chill the suspect's further discussion of his criminal scheme with the cooperating witness . . . .

Nor is the suspect likely to discuss his intended criminal scheme with the cooperating witness while others are or may be within hearing distance . . . .

Similarly, and particularly since investigators do not know and cannot predict with accuracy when or where the conversations between the suspect and the consenting person will occur, there is no way that investigators can plan to be in a position to overhear conversations between the suspect and consenting person. Once a location is known, investigators may not have time or legal access so they could survey the location and select a secreted listening position prior to the meeting

. . . .

. . . This detective has reviewed Firoved's text messages to [KP]. Likely because Firoved is careful in his text messages, they, standing alone, do not adequately flesh out Firoved's intended felony rape of a child.

Finally, the application stated that recordings were needed to overcome any claims that Firoved was boasting or joking or that he was entrapped:

It is anticipated entrapment may be a defense to any criminal charges that result from this investigation. The suspect may also claim that he was not seriously planning to have sex with a child, but was merely 'fantasizing' or 'kidding' about it; and that he did not actually engage in oral sex with his 14 year old niece, but that he was merely "talking big" to [KP]. Possession of all the actual verbal exchanges between the suspect and the cooperating witness, in the form of a recording, are necessary to resolve these issues. A recording of conversations between the suspect and the cooperating witness will provide evidence of exactly what is said by who, thus providing investigators with evidence that will be critical to sorting out who planned or is planning the crimes, and whether that person is being encouraged in any way to commit crimes that he wouldn't otherwise commit, or admit to crimes that he hasn't actually committed.

Firoved's challenge to this basis for the recordings is not persuasive. He contends the State can support an attempt charge with writings alone, especially when, as in this case, the writings are personal texts concerning the offense. But the qualitative difference between written and spoken statements will sometimes justify recording the suspect's voice in order to show a mental state not otherwise captured in writing. As the superior court

-8-

noted, recorded conversations could help a jury determine whether Firoved was joking, fantasizing, or serious about having sex with KP's daughter.

In summary, we conclude that, taken together, the above-quoted facts are "minimally adequate" to support the court's authorization of the recordings. The superior court did not err in denying Firoved's motion to suppress.

Last, Firoved contends the court erred in failing to enter written findings of fact and conclusions of law as required by CrR 3.6. The findings and conclusions were filed after Firoved filed his opening brief on appeal. The State argues, and Firoved does not dispute, that the delayed entry of findings is proper so long as there is no resulting prejudice. State v. Gaddy, 114 Wn. App. 702, 705, 60 P.3d 116 (2002), aff'd on other grounds, 152 Wn.2d 64, 93 P.3d 872 (2004) (appellate court will not reverse for tardy entry of findings unless defendant can establish either that he was prejudiced by the delay or that findings and conclusions were tailored to meet the issues in his appellate brief). Firoved has not filed a reply brief or shown any specific prejudice resulting from the tardy findings. Accordingly, his claim fails.

Affirmed.

WE CONCUR:

-9-