FILED
COURT OF APPEALS
DIVISION II

2014 DEC 30 AM 9: 44

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

BY_____
DEPUTY

| | |
|---|---|
| STATE OF WASHINGTON, | No. 40504-1-II |
| Respondent, | Consolidated with |
| | Nos. 43974-3-II; 44150-1-II |
| v. | |
| DINO J. CONSTANCE, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, P.J. — Dino Constance was convicted of three counts of solicitation to commit first degree murder[1] and one count of solicitation to commit second degree assault.[2] His conviction for the third count of solicitation to commit first degree murder was affirmed on direct appeal. *State v. Constance*, 154 Wn. App. 861, 865, 226 P.3d 231 (2010).[3] Constance now appeals two superior court orders: an order denying his first CrR 7.8[4] motion for relief from judgment, and an order granting in part his second CrR 7.8 motion for relief from judgment.

---

[1] Former RCW 9A.28.030 (1975); RCW 9A.32.030.

[2] Former RCW 9A.28.030; Former RCW 9A.36.021 (2003).

[3] Constance appealed only his conviction for the third count of solicitation to commit first degree murder on direct appeal. *Constance*, 154 Wn. App. at 877.

[4] CrR 7.8(b) allows the superior court to relieve a defendant from a final judgment with proof: (1) of mistakes or irregularity in obtaining the judgment; (2) of newly discovered evidence that by due diligence could not have been discovered in time to move for a new trial; (3) of fraud, misrepresentation, or other misconduct of an adverse party; (4) that the judgment is void; or (5) that any other reason justifies relief.

Concerning the order denying his first CrR 7.8 motion, Constance argues that the superior court's finding that his counsel did not prevent Constance from testifying fails to support the conclusion that his right to testify was not violated. In making this argument, Constance urges us to abrogate the rule that a claim for denial of the right to testify requires a showing that counsel actually prevented the defendant from testifying. We decline this invitation to abrogate our long-standing rule and affirm the superior court's first CrR 7.8 order.

Concerning the order partially granting his second CrR 7.8 motion, Constance argues that (1) double jeopardy precludes consecutive sentences on Counts I and II, (2) the State committed numerous *Brady*[5] violations, and (3) the State's *Brady* violation that required a retrial on Count IV also requires a retrial on Counts I-III. Constance also argues that trial counsel provided ineffective assistance by failing to (4) request a *Franks*[6] hearing, (5) make "motions" challenging the recording of Constance's voice as he talked to trial counsel on a jail phone, and (6) propose a true threats instruction. We reject all of Constance's arguments and affirm the superior court's second CrR 7.8 order. Consistent with that order, we remand for a retrial on Count IV, criminal solicitation to commit second degree assault.

Constance also filed a statement of additional grounds (SAG), claiming (1) the State committed additional *Brady* violations, (2) his counsel provided ineffective assistance in additional ways, (3) the State failed to show cause at the show cause hearing on his first CrR 7.8

---

[5] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[6] *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

motion, (4) the judge was biased, (5) the State violated discovery rules and the Public Records Act,[7] and (6) the State failed to preserve evidence after trial. We reject Constance's SAG claims.

## FACTS

A jury found Dino Constance guilty of three counts of criminal solicitation to commit first degree murder for separately soliciting three different individuals to kill his ex-wife Jane Koncos, and one count of criminal solicitation to commit second degree assault for soliciting Zachary Brown to assault Koncos. Each count was based on the solicitation of a separate witness—the unique individual who Constance solicited to harm Koncos in each case. We summarize these counts as follows:

Count I–Solicitation to First Degree Murder: for soliciting Michael Spry

Count II–Solicitation to First Degree Murder: for soliciting Jordan Spry

Count III–Solicitation to First Degree Murder: for soliciting Ricci Castellanos

Count IV–Solicitation to Second Degree Assault: for soliciting Zachary Brown

The jury received an instruction to consider each count separately.

A. *Procedural Facts*

1. *Constance's Direct Appeal*

Constance directly appealed only his conviction for Count III, arguing that the superior court erred by denying Constance's motion to suppress the interception of his conversation with Castellanos. Division One of this court affirmed Constance's conviction on Count III, but did

---

[7] Chapter 42.56 RCW.

not address material omissions or misrepresentations in the affidavit supporting the application to intercept. *Constance*, 154 Wn. App. at 865, 877.

### 2. *Constance's First CrR 7.8 Motion*

While Constance's direct appeal was pending, Constance filed his first motion for relief from judgment under CrR 7.8. The superior court granted Constance an evidentiary hearing on whether Constance's trial counsel violated Constance's right to testify in his own defense. At this evidentiary hearing, the superior court heard testimony from Constance, Constance's father, Constance's mother, and Constance's trial counsel.

The superior court issued findings of fact and conclusions of law on Constance's first CrR 7.8 motion, ruling that Constance had not established that trial counsel actually prevented Constance from testifying, and thus, had not proven an ineffective assistance of counsel claim. The superior court entered a final order denying Constance's first CrR 7.8 motion. Constance appealed this order.

### 3. *Constance's Second CrR 7.8 Motion*

After filing a notice of appeal of the superior court's CrR 7.8 order, Constance filed a second CrR 7.8 motion, challenging all four counts. Again, the superior court scheduled an evidentiary hearing. We stayed the appeal of the superior court's first CrR 7.8 order pending the outcome of the second CrR 7.8 motion.

After the evidentiary hearing on Constance's second CrR 7.8 motion, the superior court concluded that the State had committed a *Brady* violation warranting reversal of Count IV (solicitation to second degree assault for soliciting Zachary Brown), but not Counts I, II, or III. The superior court denied Constance's motion as to Counts I, II, and III, and made numerous,

4

specific findings of fact and conclusions of law. The superior court granted Constance's motion as to Count IV, vacating the judgment and sentence and granting him a new trial on that count.

Constance then appealed the superior court's order partially granting his second CrR 7.8 motion, arguing that the superior court should have also reversed Counts I, II, and III. We lifted the stay on Constance's appeal of the first CrR 7.8 order, and consolidated it with the appeal of the second CrR 7.8 order. Order Lifting Stay, *State v. Constance*, No. 40504-1-II, consolidated with No. 43974-3-II (Wash. Ct. App. March 22, 2013). Below is a summary of the superior court's findings of facts and conclusions of law.

B.     *Constance's Trial Counsel*

Constance was initially represented by pretrial counsel, who procured an investigator and conducted witness interviews. Pretrial counsel withdrew from Constance's case and was replaced by trial counsel. Pretrial counsel turned Constance's case file over to trial counsel. Trial counsel hired an investigator who conducted background checks on witnesses and assisted with interviews. Trial counsel spoke with Constance many times prior to trial.

C.     *Detective John O'Mara's Internal Affairs History*

Detective John O'Mara of the Clark County Sheriff's Office investigated Constance's case for the State. Detective O'Mara's internal affairs history described numerous internal affairs investigations regarding his conduct, including "failure to make proper reports, and to follow department guidelines and procedures." Clerk's Papers (CP) (43974-3-II) at 3978. The State did not provide Constance with Detective O'Mara's internal affairs history, nor did trial counsel request them. The superior court concluded that there was no *Brady* violation related to Detective O'Mara's internal affairs history.

5

D.   *Count I—Michael Spry*

Michael lived with his son Jordan, and Constance.[8] Michael testified at Constance's trial

that Constance repeatedly offered him several thousand dollars to seriously injure or kill Koncos.

Constance enticed Michael to commit these crimes separately from his enticement of Jordan.[9]

1. *Michael's Son's Child Molestation Conviction*

Michael's other son, Michael Craig Spry (Craig)[10] was convicted of first degree child

molestation, and was serving an indeterminate prison sentence when Michael and Jordan

cooperated with law enforcement in Constance's case.  The State did not discuss Craig's

sentence or prison conditions with Michael or Jordan, and did not imply that Michael or Jordan's

failure to cooperate would affect Craig's sentence or prison conditions.  Neither the State nor

trial counsel searched for or possessed information about Craig's conviction.  The superior court

concluded that there was no *Brady* violation or ineffective assistance of counsel related to

Craig's convictions.

2. *Investigation of Craig's Child Molestation Charges*

Officer Bradley Chicks of the Washougal Police Department, the officer who

investigated the child molestation charges that led to Craig's conviction, believed that Michael

was interfering with the investigation and tampering with a witness.  When Officer Chicks

---

[8] We refer to Michael and Jordan by their first names for clarity, intending no disrespect.

[9] Many of the superior court's rulings that are labeled as findings of fact are really conclusions of law. "Findings of fact labeled as conclusions of law will be treated as findings of fact when challenged on appeal." *Morgan v. Dep't of Soc. & Health Servs.*, 99 Wn. App. 148, 152, 992 P.2d 1023 (2000).

[10] Because Michael's son is named Michael Craig Spry, we refer to him as Craig to avoid confusion, intending no disrespect.

confronted Michael, Michael denied the accusations. Officer Chicks considered referring the matter for prosecution, but decided against conducting an additional investigation, or referring the case for prosecution. Officer Chicks recorded this information on a police report. Neither the State nor trial counsel searched for or possessed this information. The superior court concluded that there was no *Brady* violation or ineffective assistance of counsel related to Michael's alleged interfering or tampering with a witness.

### 3. *Eisele's and Jones's Allegations Against Michael*

Michael's ex-wife Linda Eisele and Michael's former friend Gordon Jones stated that they would have provided testimony against Michael in Constance's trial. Eisele would have testified that Michael engaged in sexual misconduct. Eisele would have also testified that Michael did not tell her that Constance solicited him to kill Koncos prior to Constance being charged. Jones would have testified that, in his opinion, Michael was a liar and violent towards women. None of the allegations made by Eisele or Jones led to any charges against Michael. Neither the State nor trial counsel searched for or possessed this information. The superior court concluded that there was no *Brady* violation or ineffective assistance of counsel related to the potential testimonies of Eisele or Jones.

E.     *Count II—Jordan*

Jordan lived with his father Michael and Constance. Jordan testified that while they lived together, Constance repeatedly solicited Jordan to seriously injure or kill Koncos, in exchange for $5,000 for her injury or $10,000 for her death. Jordan was enticed to commit the crime separately from Michael. Jordan's testimony established Count II.

7

1. *Jordan's Texas Warrants*

In Texas, a store manager filed a citizen's complaint against Jordan, alleging that Jordan passed eight worthless checks. Based on these complaints, a justice of the peace issued several warrants for Jordan's arrest. The State disclosed to trial counsel that additional information concerning Jordan existed in Texas's wanted persons file, and provided trial counsel with instructions for how to access that information. Neither the State nor trial counsel searched for or possessed information about the warrants. The superior court concluded that there was no *Brady* violation or ineffective assistance of counsel related to Jordan's Texas warrants.

2. *Report of Koncos's Police Complaint Report*

At a time when Koncos had a restraining order against Constance, Koncos contacted police, alleging that someone had knocked at her door in the middle of the night, and that she had seen Constance walking away from her front door. Law enforcement officers arrested Constance for violation of the restraining order. Officers interviewed Jordan, and Jordan stated that Constance was home asleep at the time Koncos alleged Constance to be at her door. During the interview, Jordan did not tell the officers that Constance had solicited him to kill Koncos. Jordan's written statement concerning Constance's alibi was recorded in the police report of the incident.

The State possessed this police report. A *portion* of this report was attached to the authorization to intercept and record conversations between Constance and Castellanos, which was prepared by Detective Bryan Acee of the Vancouver Police Department, and Detective Omara. But the portion containing Jordan's statement was not attached. The portion containing Jordan's statement was not provided to trial counsel, and trial counsel did not seek this

statement. But because other sources provided trial counsel with the information contained in the statement, it was cumulative with other evidence in the case. The superior court concluded that there was no *Brady* violation or ineffective assistance of counsel related to this omission.

### 3. *Impersonating a Member of the Grant County Sheriff's Office*

Lacey Spry had obtained a restraining order against Jordan. Jordan was arrested for violating this restraining order by improper phone contact. The police reports on this arrest included an allegation that Jordan impersonated a member of the Grant County Sheriff's Office in one of his phone contacts. Jordan was not arrested, charged, or convicted of any crime for this alleged impersonation of a member of the Grant County Sheriff's Office. Neither the State nor trial counsel searched for or possessed the police report. The superior court concluded that there was no *Brady* violation or ineffective assistance of counsel related to Jordan's alleged impersonation of a law enforcement officer.

## F. *Count III—Castellanos*

Castellanos was housed in a jail with Constance. Constance approached Castellanos and offered him money in exchange for killing Koncos. Constance and Castellanos discussed multiple compensation amounts and methods of committing the crime. Castellanos reported these conversations to the police, and agreed to have the police record his telephone conversations with Constance. Castellanos's testimony provided the basis for Count III.

### 1. *State's Work Crew Duty Deal with Castellanos*

In exchange for Castellanos's cooperation in Constance's case, the State made a deal with Castellanos, agreeing to assist Castellanos with avoiding the consequences of failing to perform work crew duty. At first, Castellanos's work crew duty was converted to electronic home

confinement. But that electronic home confinement was waived after Castellanos testified in Constance's case. The State disclosed the work crew duty deal to trial counsel, and trial counsel cross-examined Castellanos on the deal at trial. But the State did not disclose the specific steps taken by the State to honor the work crew duty deal, i.e., the deal's "mechanics." *See* CP at 4029. The superior court concluded that there was no *Brady* violation related to this deal.

2. *State's Payment of $200 to Castellanos*

The State also paid Castellanos $200 in exchange for his cooperation in Constance's case. In a recorded interview, Detective O'Mara disclosed this payment to pretrial counsel. That recorded interview was transcribed and available to trial counsel, who learned about the payment and made a strategic choice to not cross-examine Castellanos about it at trial. The superior court concluded that no *Brady* violation occurred because evidence of the $200 payment was disclosed, and no ineffective assistance of counsel claim was shown because trial counsel knew about the payment and made a strategic choice to not use it to impeach Castellanos.

3. *Castellanos's 2005 Mental Health Evaluation*

In 2005, Castellanos was given a mental health evaluation for his social security disability claim. Castellanos's mental health evaluation was provided to the Clark County District Court to fulfill a condition of Castellanos's sentence in a city of Vancouver criminal proceeding. Neither the State nor trial counsel searched for or possessed Castellanos's mental health evaluation.

The report detailed Castellanos's long psychiatric history, including at least nine psychiatric hospitalizations, and his struggles with homicidal ideation and suicide attempts. The report determined that Castellanos has "characterological wounding of a cluster B nature; most

10

likely narcissistic and [antisocial] wounding with impulsive activity and anger." Ex 113. But

the report also determined that

> [Castellanos's] [t]hought content showed *no delusions, AV hallucinations, or history of same.* There was *no formal thought disorder.* There is a long history of suicidal ideation and attempts though none current. There is a previous history of homicidal ideation though none currently and hospitalizations around this. Ability to abstract, calculate and remember found that the client could remember three out of three objects immediately and three out of three again at five minutes. . . . [Castellanos] could maintain abstractive ability to similarity questions. . . . A subjective assessment of intelligence would be in the low-average to average range. Much of this may be due to his level of schooling.

Ex. 113 (emphasis added); *see also* CP at 4002. The superior court concluded that there was no

*Brady* violation or ineffective assistance of counsel related to Castellanos's mental health report.

### 4. *Castellanos's Status as a Suspect in a Musical Instrument Theft*

While Castellanos was cooperating with the investigation against Constance, Castellanos

was listed as a suspect in a then ongoing investigation of an unrelated theft of musical

instruments. No charges were ever filed in the case, and Castellanos was never interviewed

concerning the incident. The prosecutor on Constance's case did not discuss the incident with

Castellanos, or tell him that he knew about the investigation, or that Castellanos was listed as a

suspect. The State knew Castellanos was a suspect in the instrument theft, but did not disclose

information about this to trial counsel. The superior court concluded that there was no *Brady*

violation or ineffective assistance of counsel related to this investigation.

### 5. *Castellanos's Civil Suits Against the Jail*

While in jail, Castellanos filed many civil suits against the jail, arguing for his release in

some of them. The State did not provide this information to trial counsel, and trial counsel did

not seek or obtain this information. The superior court concluded that there was no *Brady* violation or ineffective assistance of counsel related to these lawsuits.

6. *Assistance to Castellanos as an Assault Victim*

While Castellanos was cooperating with the investigation against Constance, Castellanos's girlfriend was charged with fourth degree assault and malicious mischief. Castellanos was the victim of these crimes. Castellanos contacted the prosecutor's office multiple times concerning the assault. During some contacts he asked for the assault charges to be dropped, while in other contacts he complained that his girlfriend was violating a no-contact order issued in the case. Some of the prosecutor's staff members working on Constance's case forwarded his concerns to other staff members who were involved in prosecuting the assault. The prosecutor's office responded to Castellanos's concerns only because he was a victim, not because he was a witness in Constance's case. Castellanos viewed the prosecutor's office's response to his concerns as completely separate from his cooperation with authorities as a witness in Constance's case.

The State did not disclose information about Castellanos's girlfriend's charges to trial counsel, and trial counsel did not discover the information. The superior court concluded that there was no *Brady* violation or ineffective assistance of counsel related to the prosecutor's office's response to Castellanos's concerns.

7. *State's Prevention of the Issuance of a Bench Warrant*

Castellanos's failure to attend a payment review hearing concerning his legal financial obligations in unrelated cases led the superior court to authorize a bench warrant for his arrest. After the warrant was prepared, a staff member of the prosecutor's office sent a note to another

member of the prosecutor's staff requesting the bench warrant's issuance be postponed because Castellanos was a material witness in the Constance case. This led to the warrant never being issued.

The State did not advise Castellanos that it had prevented the warrant's issuance. Castellanos was not aware of the payment review proceeding, or the prevention of the warrant's issuance prior to the second CrR 7.8 evidentiary hearing. The State did not disclose information about preventing the warrant's issuance to the State, and trial counsel did not discover it. There was no evidence of any implicit or explicit deals between the State and Castellanos concerning preventing the warrant's issuance. The superior court concluded that the State should have disclosed the prevention of the bench warrant's issuance because it had "marginal impeachment value." CP at 4031-32. But the superior court concluded that no *Brady* violation occurred related to this warrant.[11]

G.    *Count IV—Brown*

Brown was also housed in a jail with Constance. After Constance was arrested for criminal solicitation to commit murder, Detective O'Mara questioned Brown. At that interrogation, Brown stated that Constance had offered him money to assault and injure Koncos. Brown's testimony provided the basis for Count IV.

Brown was subject to no-contact orders prohibiting him from contacting a protected person. During the interrogation, Brown asked if Detective O'Mara could assist him in vacating

---

[11] The superior court concluded that the evidence was inadmissible for impeachment purposes, but also that it should have been disclosed for its impeachment value. We interpret this conclusion as two alternative rulings.

13

the no-contact orders against him, and Detective O'Mara said that they would discuss it after Brown testified in Constance's trial. Later, the State assisted Brown in moving the superior court to vacate the no-contact order against him and also recommended that the superior court vacate the no-contact order. As a result, the superior court vacated Brown's no-contact orders. The State did not disclose Brown's request or the State's assistance in vacating these orders. The superior court concluded that the State's failure to disclose this information constituted a *Brady* violation because it was an inadvertent suppression of impeachment evidence against Brown that prejudiced Constance. The superior court ruled that this *Brady* violation required reversal of Count IV, but not Counts I, II, or III. Thus, the superior court reversed Constance's conviction for, and ordered a new trial on Count IV.

H.    *Threatening E-mails between Michael and Constance and between Jordan and Constance*

Michael and Constance sent threatening e-mails to each other. The e-mails concerned disputes over money Michael believed Constance owed him. In these e-mails, Michael threatened to expose Constance's "history" and also to "see [N.C.[12]] protected and [Constance] stopped!!!" CP at 3998. Jordan and Constance also sent threatening e-mails to each other. The content of Jordan's e-mails were similar to Michael's. Michael provided copies of all of these e-mails to Detective O'Mara.

The State did not provide these e-mails to trial counsel, and trial counsel did not seek or receive them. The e-mails were cumulative of other evidence in the trial because the information in the e-mails was available to trial counsel from other sources, including Constance. Trial

---

[12] N.C. is Constance's son. We use initials to protect the minor's privacy.

counsel did not ask Michael about the e-mails at trial, but did elicit information about Michael's hatred of Constance and a description of their disputes. Jordan referenced Constance's threats in the e-mails during his testimony.

The superior court concluded that the State should have provided the defense with copies of the e-mails. The superior court also concluded that trial counsel was deficient for failing to discover these e-mails. But the superior court concluded that there was no *Brady* violation or ineffective assistance of counsel related to these e-mails.

I.      *No True Threats Instruction*

Constance did not testify at his trial. *Constance*, 154 Wn. App. at 877. No "true threats" instruction was proposed by trial counsel or given to the jury. CP at 4011. The superior court concluded that trial counsel did not provide ineffective assistance for failing to propose a "true threats" instruction because a true threats instruction was unnecessary in a trial on a criminal solicitation charge.

J.      *Double Jeopardy*

A jury convicted Constance of all four counts. Constance received consecutive sentences for Counts I, II, and III, and a concurrent sentence for Count IV. The superior court concluded that the sentencing court's imposition of consecutive sentences did not violate double jeopardy.

K.      *Interception of Calls with Trial Counsel*

While Constance was in jail for the criminal solicitation charges, police obtained a court order authorizing interception of communications between Constance and Gregory Wright. Wright was intentionally housed next to Constance to facilitate interception of his conversations

15

with Constance. Constance had limited access to only one phone, and was required to schedule his calls to trial counsel with the jail.

Constance engaged in telephone conversations with trial counsel while he was in jail. Because Wright was nearby, Wright's interception recorded Constance's voice as he talked with trial counsel.

After the interception ended, Detective O'Mara reviewed Wrights' recordings. Detective O'Mara concluded that none of the information was incriminating, and some might be exculpatory. Detective O'Mara provided the recording to the State, who provided it to trial counsel. Trial counsel expressed concern to the superior court that the recordings contained conversations with him. These recordings of Constance's telephone conversations were not admitted at trial. The superior court ruled that no imposition of sanctions was warranted based on these recordings because any intrusion on Constance's conversations with his counsel was not deliberate. The superior court further concluded that the recordings were not privileged because Constance spoke in a loud voice where other inmates could hear him and he chose to discuss these conversations with Wright.

L.    *Affidavit for Application To Intercept Conversation Between Constance and Castellanos*

Detective Acee applied for authority to intercept and record conversations between Constance and Castellanos after both were released from jail. The application contained Detective Acee's sworn affidavit. The affidavit stated that Michael and Jordan each gave sworn testimony under oath that Constance had offered each of them, independently of each other, $10,000 to kill Koncos. The affidavit also relayed the following allegations from Castellanos: ·

16

CASTELLANOS said CONSTANCE had stated, "I need someone to kill my ex." CASTELLANOS indicated to CONSTANCE that he could have her killed, but it would cost him about fifteen thousand dollars. CONSTANCE then negotiated the price down to three to five thousand dollars. CASTELLANOS said he would accept the lesser amount. CASTELLANOS said CONSTANCE questioned him about who would commit the murder and by what means they would do it. CONSTANCE did not mention his ex-wife by name, but described her as being 5'10" in height, a masseuse that advertises on Craig's List, the mother of his only child and said she lived in a four-plex off Mill Plain Boulevard. CONSTANCE would later tell CASTELLANOS that his ex-wife's name was "Jean KONCOS". Detective O'Mara told me KONCOS is 510", lives at a location off Mill Plain Boulevard, has a two and a half year old child with CONSTANCE and that she is a masseuse, who advertises her business on Craig's List.

CONSTANCE suggested CASTELLANOS could club KONCOS over the head and throw her off the side of his boat. CONSTANCE said if they timed it right, the tide could carry her body thirty miles away and "out to sea."

Ex. 97 at 4. The affidavit continued:

Detectives O'Mara and O'Dell conducted a thorough interview of COSTELLANOS. At the conclusion on the recorded interview, Detective O'Mara had the interview transcribed. The text of the interview has been attached hereto as a ten page document . . . . O'Mara told me he believed COSTELLANOS' account of the incident to be truthful because COSTELLANOS had specific knowledge and information pertaining to CONSTANCE's ex-wife.[13]

Ex. 97 at 5.

The affidavit also contained the following information about Castellanos's

criminal history:

A review of Vancouver Police Department and Clark County Sheriff's Office records indicate CONSTANCE has been listed as the suspect in five (5) separate domestic violence assaults with KONCOS over the past three years . . . . The same database lists CONSTANCE as being in violation of a court issued protection order with KONCOS on eleven (11) separate incidents over the past three years.

---

[13] The misspellings of Castellanos's name as "Costellanos" are in the original affidavit.

Ex. 97 at 6. The affidavit listed each assault and violation of a protection order incident by case number, and declared that these incidents were all in "Exhibit No. 5." Ex. 97 at 6. The affidavit also stated that:

> A review of CONSTANCE's criminal history indicates he has sixteen (16) prior arrests in Washington, Oregon and Colorado with convictions for Criminal Mischief in the First Degree (x2), Violation of a Domestic Violence Protection Order, Prostitution, Disorderly Conduct, and DUI.

Ex. 97 at 6. In actuality, "Exhibit No. 5" contained only 10 of the 11 protection order violations, and included an additional harassment charge not mentioned in the affidavit. In three of the 10 protection order violations Koncos was a suspect. In three of the five assaults, Koncos was a suspect. The superior court granted an order authorizing interception based on Detective Acee's affidavit.

Following the order authorizing interception, Constance made a police report accusing Jordan of blackmail. Constance alleged that both Michael and Jordan threatened to falsely testify against him if he did not pay them money that Constance allegedly owed them. Constance gave the police a CD (compact disc) containing two voice messages allegedly left by Jordan. The police report states that the male voice on the CD said that Constance owed money to Jordan's father, and that this was not blackmail because Constance owed Jordan's father money.[14] The blackmail police report was distributed to Detective O'Mara.

Later, Detective O'Mara prepared an application to extend the authority to intercept conversations between Constance and Castellanos. This application included Detective

---

[14] The CDs themselves are not in the record on appeal.

O'Mara's affidavit which incorporated Detective Acee's affidavit and attachments by reference. Detective O'Mara's affidavit concerned primarily the need for an extension of time, due to practical problems with setting up the intercept. Detective O'Mara's affidavit did not include information about Constance's blackmail report or Jordan's voice messages. The superior court granted a second order authorizing interception based on Detective O'Mara's affidavit. Consequently, law enforcement intercepted and recorded phone conversations between Constance and Castellanos laying out detailed plans both for Castellanos to contact Koncos at her workplace without raising suspicion and for Constance to pay Castellanos. *Constance*, 154 Wn. App. at 874.

Constance's trial counsel moved to suppress the recordings of this intercept, but did not base this motion on material misrepresentations or omissions in the affidavit. The intercept recordings were admitted against Constance at trial. 154 Wn. App. at 874. When deciding Constance's first appeal, Division One of this Court summarized the wire recordings as follows:

> Constance gives Castellanos Koncos's telephone number and instructs Castellanos about how to go about scheduling a massage appointment with her. Constance tells Castellanos to call Koncos using a pay phone, but to make sure to use "*67" so Koncos would not know he is using a pay phone. Constance instructs Castellanos to get a haircut and grow a beard. Constance also tells Castellanos what he should say to avoid suspicion, emphasizing that "this has to be done right or you're gonna get busted." When Castellanos asks Constance "We still want her dead, right?" Constance responds, "We don't want to talk about things like that on the telephone." Constance then tells Castellanos how to avoid leaving fingerprints and "how to get away with this." Constance says he will leave Castellanos the money and when he is scheduled to be out of town "we will get this done."

154 Wn. App. at 874.

After the CrR 7.8 hearing, the superior court concluded that trial counsel was not ineffective for failing to request a *Franks* hearing to challenge the alleged material misrepresentations or omissions in the affidavit.

To summarize, after two CrR 7.8 hearings, the superior court concluded that the State's failure to disclose Brown's request that the State drop a no contact order in exchange for his testimony against Constance constituted a *Brady* violation warranting reversal of Count IV, but not Counts I, II, or III. The superior court found no other *Brady* violations and no instances of ineffective assistance of counsel, and affirmed Counts I, II, and III. Constance appeals the superior court's orders.

## ANALYSIS

We review a superior court's denial of a CrR 7.8 motion for relief from judgment for abuse of discretion. *State v. Martinez*, 161 Wn. App. 436, 440, 253 P.3d 445 (2011). A superior court abuses its discretion when it adopts a view that no reasonable person would take, applies the wrong legal standard, or relies on unsupported facts. *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 668-69, 230 P.3d 583 (2010).

We review the findings of fact on a CrR 7.8 motion for substantial evidence. *State v. Ieng*, 87 Wn. App. 873, 877, 942 P.2d 1091 (1997). Substantial evidence is a sufficient quantity of evidence to persuade a rational, fair-minded person that a finding is true. *State v. Schultz*, 170 Wn.2d 746, 753, 248 P.3d 484 (2011). We defer to the trier of fact on credibility issues. *State v.*

No. 40504-1-II
Consolidated with Nos. 43974-3-II; 44150-1-II

*Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Unchallenged findings of fact are verities on appeal.[15] *State v. Robinson*, 104 Wn. App. 657, 668, 17 P.3d 653 (2001).

Finally, we review whether the findings of fact support the conclusions of law and judgment. *Ieng*, 87 Wn. App. at 877. We review issues of law de novo. *State v. Macon*, 128 Wn.2d 784, 799, 911 P.2d 1004 (1996).

---

[15] "A party abandons assignments of error to findings of fact if it fails to argue them in its brief." *Valley View Indus. Park v. City of Redmond*, 107 Wn.2d 621, 630, 733 P.2d 182 (1987). Arguments and issues incorporated by reference to documents presented to the superior court are deemed waived. *See U.S. West Commc'ns, Inc. v. Utils. & Transp. Comm'n*, 134 Wn.2d 74, 111-12, 949 P.2d 1337 (1997).

In the briefing on Constance's first CrR 7.8 motion, Constance lists three findings of fact in his brief's "assignments of error" section. But Constance makes only two arguments against those findings, in footnotes, neither of which we consider.

In the brief concerning his first CrR 7.8 hearing, Constance first assigns error to the finding that conversations about whether Constance should testify occurred during trial rather than during pretrial preparation. But Constance does not challenge that the conversations occurred, and *when* the conversation occurred is not relevant to our resolution of this case. Constance next assigns error to the superior court's finding that his testimony at the evidentiary hearing was not credible. But we defer to the superior court's determination of credibility. Because they are unchallenged, we treat the remaining findings of fact on Constance's first CrR 7.8 motion as verities.

In the briefing on Constance's second CrR 7.8 motion, Constance challenges no findings of fact in the opening brief. In his reply brief, Constance states that he took exception to 13 findings of fact *at the superior court level*, but he provides no argument challenging those findings.

In Constance's SAG concerning the second CrR 7.8 motion, he lists some findings of fact, and asks us to "examine the record with respect to the [13 findings challenged at the superior court level]" and "correct them independent of all other rulings." SAG at 32, 41. But Constance provides no discussion as to why those factual findings are incorrect. We are "not obligated to search the record in support of claims made in a defendant's [SAG]." RAP 10.10. Thus, the findings on Constance's second CrR 7.8 motion are also verities.

No. 40504-1-II
Consolidated with Nos. 43974-3-II; 44150-1-II

## FIRST CrR 7.8 ORDER

Constance argues that his trial counsel violated his right to testify by failing to adequately prepare him for trial. Constance argues that he should not be required to show that trial counsel actually prevented him from testifying in order to prevail on his CrR 7.8 motion. Constance argues that he should prevail by simply showing deficient performance and prejudice. We disagree.

The United States and Washington constitutions protect a defendant's right to testify on his or her own behalf. WASH. CONST. art. I, § 22; *Rock v. Arkansas*, 483 U.S. 44, 51-52, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987) (noting that the right has its origins in due process and the Fifth, Sixth, and Fourteenth Amendments). In *State v. Robinson*, our Supreme Court recognized that this right is violated when trial counsel *actually prevents* the defendant from testifying. 138 Wn.2d 753, 761, 982 P.2d 590 (1999).

Constance argues that the superior court's conclusion that counsel did not actually prevent his testimony is insufficient to support the order denying his CrR 7.8 motion. He argues that as long as he can show deficient performance of any kind, he can prevail on a claim for the denial of the right to testify. But *Robinson* requires the defendant to show that trial counsel actually prevented the defendant from testifying. 138 Wn.2d at 761.

22

The *Robinson* court held that in order to merit reversal, a defendant's claim that trial counsel denied his or her right to testify must satisfy both factors of the ineffective assistance of counsel test.[16] 138 Wn.2d at 765-66. A defendant shows ineffective assistance of counsel by showing that counsel's performance was (1) deficient and (2) prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Performance is deficient when it "[falls] below an objective standard of reasonableness," and is prejudicial when the defendant can show a reasonable probability that the result of the proceeding would have been different absent the deficient performance. 466 U.S. at 688, 694.

But, to emphasize, the *Strickland* test is used to determine whether a violation of the defendant's right to testify warrants reversal, not whether a violation has occurred in the first place. A defendant may not meet the first prong of the *Strickland* test on a claim for the violation of the right to testify by simply showing some sort of deficient performance. The only way to satisfy the first prong of the *Strickland* test on such a claim is to "prove that [counsel] actually prevented [the defendant] from testifying." *Robinson*, 138 Wn.2d at 766; *see also State v. Borsheim*, 140 Wn. App. 357, 376, 165 P.3d 417 (2007). Thus, the question on appeal is whether the superior court's findings of fact support its conclusion that Constance was not actually prevented from testifying.

---

[16] Constance argues that *Robinson* is wrong on this issue, and he invites us to follow *LaVigne v. State*, 812 P.2d 217 (Alaska 1991), which analyzed this issue as a simple constitutional error and required a waiver of the right to testify on the record. *See LaVigne*, 812 P.2d at 220-22. Constance also urges us to follow the dissent in *Robinson*, which argued that violation of the right to testify should be reversible error per se. 138 Wn.2d at 772-73 (Alexander, J., concurring in part, dissenting in part). Because Constance provides no reasoned argument on either point, we do not consider these arguments. *State v. Reichert*, 158 Wn. App. 374, 389 n.7, 242 P.3d 44 (2010).

The *Robinson* court held that a defendant is "actually prevented" from testifying only when trial counsel uses coercion to prevent the defendant from taking the stand, or when the decision not to testify is made against the defendant's will. 138 Wn.2d at 762-63. The court held that coercion occurs when trial counsel tells the client he is legally forbidden to testify or makes a similar misrepresentation, or when trial counsel threatens to withdraw unless the defendant agrees not to testify. 138 Wn.2d at 762. And the court held that the decision is made against the defendant's will when trial counsel disregards the defendant's desire to testify, such as by refusing to call the client to the stand. 138 Wn.2d at 762-63. The *Robinson* court thus concluded,

> [I]n order to prove that an attorney actually prevented the defendant from testifying, the defendant must prove that the attorney refused to allow him to testify in the face of the defendant's unequivocal demands that he be allowed to do so. In the absence of such demands by the defendant, however, we will presume that the defendant elected not to take the stand upon the advice of counsel.

138 Wn.2d at 764.

Trial counsel does not violate the right to testify by merely advising the defendant not to testify. 138 Wn.2d at 763. While the defendant must make the ultimate decision whether to testify, "it is entirely appropriate for the attorney to advise and inform the client in making the decision to take the stand." 138 Wn.2d at 763.

Here, the superior court found that (1) trial counsel met with Constance to discuss the areas to be covered in Constance's direct examination; (2) trial counsel did not tell Constance he could not testify, but did not encourage him to testify because of counsel's reservations about Constance's demeanor as a witness; (3) Constance chose not to testify after observing the trial and considering his options; and (4) Constance's testimony, that counsel refused to prepare

24

Constance to testify, was not credible. The superior court concluded that trial counsel did not actually prevent Constance from testifying.

The superior court's findings support its conclusion and its dismissal of the CrR 7.8 motion. The findings show that counsel neither coerced Constance into remaining silent, nor disregarded Constance's desire to testify. As such, under *Robinson*, trial counsel did not actually prevent Constance from testifying and did not violate Constance's right to testify. We affirm the superior court's order denying Constance's first CrR 7.8 motion.

## SECOND CrR 7.8 ORDER

Constance challenges the order partially granting his second CrR 7.8 motion, arguing that (1) various *Brady* violations require reversal of all counts, (2) the suppression of impeachment evidence against Brown (that reversed Count IV) requires reversal of all counts, (3) ineffective assistance of counsel requires reversal of all counts, and (4) double jeopardy precludes consecutive sentences on Counts I and II. We disagree and affirm the superior court order.

### I. *BRADY* VIOLATIONS

Constance argues that *Brady* violations require reversal of all counts. We disagree.

We review an order denying a new trial based on alleged *Brady* violations de novo. *State v. Mullen*, 171 Wn.2d 881, 893-94, 259 P.3d 158 (2011). *Brady* imposes a duty on the State to disclose material evidence favorable to the defendant. *See Brady* 373 U.S. at 87. *Brady* states that the suppression of evidence favorable to an accused violates due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith" of the State. 373 U.S. at 87.

25

No. 40504-1-II
Consolidated with Nos. 43974-3-II; 44150-1-II

The State has a duty to learn of any favorable evidence "known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). But *Brady* does not obligate the State to communicate preliminary or speculative information. *United States v. Diaz*, 922 F.2d 998, 1006 (2d Cir. 1990). And there is no *Brady* violation if the defendant, using reasonable diligence, could have obtained the evidence. *State v. Thomas*, 150 Wn.2d 821, 851, 83 P.3d 970 (2004).

To establish a *Brady* violation, a defendant must demonstrate the existence of each of three necessary elements:

1. The State must have suppressed the evidence, either willfully or inadvertently.

2. The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching.

3. Prejudice must have ensued such that there is a reasonable probability that the result of the proceeding would have differed had the State disclosed the evidence to trial counsel.

*Strickler v. Greene*, 527 U.S. 263, 281-82, 289, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). If a defendant fails to demonstrate any one element, his *Brady* claim fails. *See* 527 U.S. at 281-82; *State v. Sublett*, 156 Wn. App. 160, 199-201, 231 P.3d 231 (2010), *as amended on reconsideration* (June 29, 2010), *aff'd*, 176 Wn.2d 58, 292 P.3d 715 (2012).

A.  *Speculative or Preliminary Information: Officer Chicks's Suspicion that Michael Interfered with a Police Investigation*

Constance argues that the State violated *Brady* by failing to disclose Officer Chicks's suspicion that Michael interfered with law enforcement's investigation of Craig's child molestation charges. We disagree.

26

Officer Chicks believed that Michael was interfering with the investigation and possibly tampering with a witness. Michael denied these claims. Officer Chicks considered referring the matter for prosecution, but ultimately decided against it. The superior court's findings show that Officer Chicks had only a preliminary or speculative hunch that Michael may have interfered with an investigation. *Brady* does not require the State to disclose this speculative or preliminary information, and, thus, failing to disclose Officer Chicks's suspicion was not a *Brady* violation.

B.     *Evidence Not Suppressed by the State*

1. *Jordan's Outstanding Texas Warrants*

Constance argues that the State violated *Brady* by failing to disclose Jordan's Texas warrants for writing bad checks. We disagree.

Here, the superior court found that the State (1) did not access or possess information concerning Jordan's warrants in Texas, (2) informed trial counsel that additional information concerning Jordan existed in Texas's wanted persons file, and (3) provided trial counsel with information on how to obtain that additional information in Texas's wanted persons file.

While the State has an affirmative obligation to learn of favorable evidence known to others acting on its behalf, the Texas police were not working on the State's behalf. *Brady* does not require the State to uncover all information from other states concerning a witness. *See Kyles*, 514 U.S. at 437. Furthermore, because the State provided trial counsel with information on how to obtain the information in Texas's wanted persons file, trial counsel with reasonable diligence could have acquired Jordan's warrants. The superior court's findings support its conclusion that the State did not suppress evidence in violation of *Brady*.

2. *Disclosure of the State's $200 Payment to Castellanos*

Constance argues that the State violated *Brady* by failing to disclose to Constance's new trial counsel that it had paid Castellanos $200. We disagree.

Here, the superior court found that the payment was disclosed to Constance's *pretrial* counsel, that the payment's disclosure was recorded and available to *trial counsel*, and that trial counsel had access to that evidence, learned of the $200 payment, and chose to not use it. Thus, the superior court's findings support its conclusion that the State did not suppress evidence in violation of *Brady*.

C.      *No Prejudice*

To show prejudice, Constance bears the burden of showing a reasonable probability that the result of the proceeding would have been different if the State had disclosed the evidence to trial counsel. *See Greene*, 527 U.S. at 281-82, 289. Many of Constance's arguments allege that the State failed to disclose evidence of specific instances of conduct of the witnesses against him.

We consider admissibility of undisclosed evidence in determining whether prejudice exists. *Mullen*, 171 Wn.2d at 897. This is because "if evidence is neither admissible nor likely to lead to admissible evidence it is unlikely that disclosure of the evidence could affect the outcome of a proceeding." *State v. Knutson*, 121 Wn.2d 766, 773, 854 P.2d 617 (1993).

ER 608(b) states in part:

> **Specific Instances of Conduct.** Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness.

28

Extrinsic evidence of collateral matters may not be offered to impeach a witness. *State v. Fisher*, 165 Wn.2d 727, 750-51, 202 P.3d 937 (2009); *State v. Carlson*, 61 Wn. App. 865, 876, 812 P.2d 536 (1991). Evidence pertains to a collateral matter if it is inadmissible for any reason other than to contradict a witness. *State v. Descoteaux*, 94 Wn.2d 31, 37-38, 614 P.2d 179 (1980), *overruled on other grounds by State v. Danforth*, 97 Wn.2d 255, 643 P.2d 882 (1982); *State v. Fankhouser*, 133 Wn. App. 689, 693, 138 P.3d 140 (2006).

### 1. *Castellanos's 2005 Mental Health Report*

Constance argues that the State violated *Brady* by failing to disclose Castellanos's 2005 mental health report. We disagree.

Generally, a superior court has discretion to admit evidence of a witness's mental condition for impeachment purposes. *State v. Froehlich*, 96 Wn.2d 301, 307, 635 P.2d 127 (1981). In Washington, mental deficiency impeachment evidence is relevant when the deficiency is readily apparent and the witness's competency is a central issue in the case. 96 Wn.2d at 306-07; *State v. Despenza*, 38 Wn. App. 645, 648, 689 P.2d 87 (1984); *see State v. Israel*, 91 Wn. App. 846, 854, 859, 963 P.2d 897 (1998) (holding that evidence of antisocial personality disorder was inadmissible).

The mental health report stated that Castellanos had a long psychiatric history and "characterological wounding of a cluster B nature; most likely narcissistic and [antisocial] wounding with impulsive activity and anger." Ex. 113 at 106. But the report also stated that Castellanos showed no delusions, hallucinations, or thought disorders, and that he had the ability to abstract, count, and remember.

Thus, while the report revealed that Castellanos had mental health challenges, it also concluded that those problems did not affect his reasoning, formal thought processes, or thinking. Thus, there is no indication from the mental health report that Castellanos's mental condition affected his ability to perceive events at the critical time and retell them to others, or affected his ability to testify. Therefore, because Castellanos's mental health history is irrelevant, Constance was not prejudiced by the State not disclosing it. *See Israel*, 91 Wn. App. at 859.

2. *Detective O'Mara's Internal Affairs History*

Constance argues that the State violated *Brady* by failing to disclose Detective O'Mara's internal affairs history. We disagree.

The superior court found that Detective O'Mara's discipline was for failure to file proper reports and follow department guidelines and procedures. This discipline history had no relevance to Constance's case, and thus, would have been inadmissible at Constance's trial. *See* ER 401. Accordingly, because there is not a reasonable probability that the result of the proceeding would have been different if the State had disclosed the evidence to trial counsel, Constance was not prejudiced and no *Brady* violation occurred.

II. SUPPRESSION OF IMPEACHMENT EVIDENCE AGAINST BROWN: EFFECT ON OTHER COUNTS

Constance argues that the State's suppression of impeachment evidence against Brown, which caused the superior court to reverse Constance's conviction on Count IV, should have also

30

No. 40504-1-II
Consolidated with Nos. 43974-3-II; 44150-1-II

compelled the superior court to reverse the other three counts because the State argued that all

four counts were part of a common scheme or plan.[17] We disagree.

A *Brady* violation warrants a new trial only if the defendant is prejudiced by the

evidence's suppression. *Mullen*, 171 Wn.2d at 897. Prejudice requires a showing that there is a

reasonable probability that the result of the proceeding would have differed had the State

disclosed the evidence to trial counsel. 171 Wn.2d at 897.

---

[17] The State made the following statements in closing argument at Constance's trial:

> All right, so [Constance] solicits four different people to do the same thing because he hates his wife. The motive is exceptionally clear in this case, we know exactly why he's trying to do what he's trying to do.
> They're getting a divorce, get in a custody dispute. And she's actually as a result of these custody disputes, [Constance] is being put in jail.
> He gets put in jail first in March, end of March, and when he's in jail that time he talks to . . . Brown. Now, it's important because, you know . . . Brown testified he doesn't know [Michael and Jordan] . . . Castellanos, doesn't know [Michael and Jordan], [Michael and Jordan] don't know these guys. These are—these are unrelated people where [Constance is] doing the same thing.
>
> . . . .
>
> [Michael and Jordan]. They don't know [Castellanos], they don't know . . . Brown. But they testify to the same thing. They said [Constance] pretty much as soon as they meet him, he's immediately, you know, talking about his wife.
>
> . . . .
>
> And they both testified very clearly that [Constance] specifically asked them, do you know anyone that'll kill my wife? Will you kill my wife? Here's how much money I'll give you if you . . . attack my wife.
>
> . . . .
>
> And an additional 5,000—$5,000 if you kill her. Both [Michael and Jordan] testified very clearly that's what [Constance] asked them to do.
> Like I say, these are unrelated people, don't know each other. Obviously [Michael and Jordan] know each other. But they're saying the same thing that . . . Brown says and the same thing . . . Castellanos says.

CP at 2210-11, 2216-17.

31

Here, Brown testified that Constance solicited him to assault Koncos. After the CrR 7.8 hearing, the superior court concluded that the State's failure to disclose its dismissal of Brown's no-contact orders constituted a *Brady* violation because it was an inadvertent suppression of impeachment evidence against Brown that prejudiced Constance, placing Brown's credibility in question. But Brown's testimony is relevant only to Count IV, criminal solicitation for assault, which accused Constance of soliciting Brown to assault Koncos, not Count's I, II, or III, which accused Constance of soliciting people *other* than Brown to *murder* Koncos. And while the State argued that Brown's testimony gave credence to Michael's, Jordan's, and Castellanos's testimonies, the State also argued that Michael's, Jordan's, and Castellanos's testimonies bolstered each other. Furthermore, the jury heard an intercept of Constance's conversation with Castellanos in which Constance planned the details of Koncos's murder. Finally, the jury was instructed to treat each count separately, and we presume the jury followed this instruction. *See State v. Perez-Valdez*, 172 Wn.2d 808, 818-19, 265 P.3d 853 (2011). Thus, the suppression of impeachment information against Brown does not create a reasonable probability that the results on Counts I, II, or III would have differed.[18]

---

[18] Constance also argues that the State's failure to disclose evidence constitutes arbitrary action or governmental misconduct warranting a new trial under CrR 8.3(b). CrR 8.3(b) gives the defendant the burden to show that the State's conduct caused actual prejudice to his right to a fair trial. *State v. Rohrich*, 149 Wn.2d 647, 658-59, 71 P.3d 638 (2003). Because each of the State's alleged nondisclosures either did not occur or did not cause prejudice, we hold that Constance failed to show that the State's alleged nondisclosures caused him actual prejudice, and we accordingly reject his CrR 8.3(b) argument.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Constance argues several instances where trial counsel allegedly provided ineffective assistance. We disagree with all of Constance's arguments.

Because claims of ineffective assistance of counsel present mixed questions of law and fact, we review them de novo. *In re Pers. Restraint of Brett*, 142 Wn.2d 868, 873, 16 P.3d 601 (2001). On an ineffective assistance of counsel claim, the defendant bears the burden of showing deficient performance and resulting prejudice. *State v. Grier*, 171 Wn.2d 17, 42-43, 246 P.3d 1260 (2011); *Strickland*, 466 U.S. at 687 (1984). Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997). Our scrutiny of counsel's performance is highly deferential; we strongly presume reasonableness. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

To establish prejudice, a defendant must show a reasonable probability that the result of the proceeding would have been different absent the deficient performance. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). Constance must show both deficiency and prejudice to prevail on an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 687.

A.      *True Threats Instruction*

Constance argues that his trial counsel provided ineffective assistance by failing to request a "true threats" jury instruction. Br. of Appellant at 49. We disagree.

The First Amendment of the United States Constitution prohibits governmental intrusion on free expression, but it allows prohibition of true threats. True threats are serious threats, not ones said in jest, idle talk, or hyperbole. *State v. Clark*, 175 Wn. App. 109, 113-14, 302 P.3d 553 (2013). But a "true threats" jury instruction is unnecessary where the pertinent statute requires

the defendant to have some mens rea as to the result of the hearer's fear. *State v. Schaler*, 169 Wn.2d 274, 287-88, 236 P.3d 858 (2010); *Clark*, 175 Wn. App. at 114-15.

The criminal solicitation statute requires that the defendant's criminal solicitation be made with "*intent* to promote or facilitate the commission of a crime." Former RCW 9A.28.030 (1975). Thus, a true threats instruction is unnecessary on criminal solicitation charges, and Constance's counsel's performance was not deficient. Constance's argument fails. *Clark*, 175 Wn. App. at 114.

B.    *Failure To Request a* Franks *Hearing to Challenge Misrepresentations and Omissions in Detective Acee's and Detective O'Mara's Affidavits*

Constance argues that his trial counsel was deficient for failing to request a *Franks* hearing to challenge the material misrepresentations and omissions in Detective Acee's and Detective O'Mara's affidavits. Again, we disagree.

Former RCW 9.73.090 (2006) states that a law enforcement officer's intercept of a nonconsenting party's communications is permissible "if there is probable cause to believe that the nonconsenting party has committed, is engaged in, or is about to commit a felony." In *Franks v. Delaware*, the United States Supreme Court announced a limited rule that addressed alleged government misconduct and determined when a hearing on allegations of misstatements must be afforded and when the exclusion of seized evidence is mandated. 438 U.S. at 167-68. The rule in *Franks* applies to intercept applications. *See State v. Cisneros*, 63 Wn. App. 724, 732, 821 P.2d 1262 (1992).

Under *Franks*, the defendant must show two things. First, the defendant must show that the affiant, deliberately or with a reckless disregard for the truth, made a material

34

misrepresentation or omission in the affidavit. *State v. Garrison*, 118 Wn.2d 870, 872-73, 827 P.2d 1388 (1992). To this end, the defendant must produce evidence of intent or recklessness; we will not infer intent or recklessness from the importance of the misrepresentations or omissions. 118 Wn.2d at 873.

Second, if the defendant can show a deliberate or reckless misrepresentation or omission, the defendant must also show that the misrepresentation or omission was necessary to the probable cause determination. 118 Wn.2d at 874. To determine necessity, we put the misrepresentation to the side of (or add the omitted information to) the affidavit and determine whether the affidavit still supports probable cause. *See* 118 Wn.2d at 873-75. As long as the affidavit can support probable cause without the omission or misrepresentation, the warrant stands. *See* 118 Wn.2d at 873-75.

We review probable cause de novo. *State v. Chamberlin*, 161 Wn.2d 30, 40, 162 P.3d 389 (2007). When determining whether probable cause exists, our review is limited to the four corners of the affidavit supporting probable cause. *State v. Neth*, 165 Wn.2d 177, 182, 196 P.3d 658 (2008). "Probable cause exists if there are sufficient facts and circumstances on reasonably trustworthy information that would cause a person of reasonable caution to believe that an offense has been committed." *State v. Gaddy*, 114 Wn. App. 702, 705-06, 60 P.3d 116, 119 (2002), *aff'd*, 152 Wn.2d 64, 93 P.3d 872 (2004). "Only the probability of criminal activity is required to show probable cause, not a prima facie showing of it." 114 Wn. App. at 706.

Constance alleges that many misrepresentations or omissions exist in the affidavit. We summarize Constance's allegations as follows:

35

1. Detective Acee stated that there was an incident where Constance attempted to abduct his son and violently assault Koncos. But Detective Acee omitted an explanation that this incident resulted in a conviction of only disorderly conduct, not child abduction or assault.

2. Detective Acee omitted a series of more recent police reports for violation of a restraining order made by Constance and Koncos against each other.

3. Detective Acee omitted part of the report on the police's investigation of Koncos's allegation that Constance had violated his restraining order. The omitted portion included Jordan's statement that Constance was sleeping at the time Koncos alleged that Constance violated his restraining order, and confirmed that Jordan did not tell the police that Constance solicited him to kill Koncos.

4. Detective Acee omitted Constance's statements denying that he was trying to harm Koncos.

5. Detective Acee omitted e-mails among Michael, Jordan, and Constance, showing that they had various disagreements and that Michael and Jordan had made threats to Constance.

6. Detective Acee omitted documents confirming that Constance was in a conflict with Michael and Jordan over a disputed debt, and that Michael and Jordan made many threats to Constance.

7. Detective Acee omitted Constance's response to Michael's and Jordan's declarations.

8. Detective Acee misrepresented Constance as a "dangerous ex-con."

9. Detective Acee misrepresented that Constance violated a protection order eleven times, when three of those cases listed Koncos as the suspect.

10. Detective Acee misrepresented that Constance was a suspect in five separate domestic violence assaults, when three of the cases listed Koncos as the suspect.

11. In his affidavit, Detective O'Mara omitted Constance's police report for blackmail, including the accompanying CD's of Jordan's voice messages to Constance.

36

Br. of Appellant at 33-39; SAG at 28-31. For purposes of our analysis, we assume without deciding that all of Constance's alleged omissions and misrepresentations exist, and were intentional and reckless. We then put all of Constance's alleged misrepresentations to the side of (or add the omitted information to) Detective Acee's and Detective O'Mara's affidavits to reach our conclusions.

Reviewing the affidavits in the manner described above, we conclude that the affidavit sufficiently supports probable cause. The misrepresentations and omissions have no effect on the information provided by Castellanos in Detective Acee's affidavit; information which independently establishes probable cause. Acee's affidavit provides Castellanos's detailed description of how Constance solicited him to kill Koncos in exchange for money, and how Constance and Castellanos discussed detailed methods of killing Koncos and covering up the crime. Castellanos provided police with detailed physical descriptions of Koncos, which he received from Constance, before Castellanos knew Koncos's name. This nonconfidential witness, standing alone, is enough evidence to cause a person of reasonable caution to believe that Constance had committed the felony of criminal solicitation to commit murder.

Because Constance's alleged misrepresentations and omissions have no effect on the information in the affidavit provided by Castellanos, they are not necessary to the determination of probable cause. Thus, trial counsel's failure to litigate *Franks* issues caused no prejudice, and Constance has failed to meet his burden of demonstrating ineffective assistance of counsel.

37

C.   *Failure To Make "Motions" Challenging Wright's Recording of Constance's Voice While Talking to Trial Counsel*

Constance argues that his trial counsel provided ineffective assistance by failing to file "motions" in response to Wright's recording of Constance's voice as he talked on the jail phone with trial counsel. Br. of Appellant at 44. We disagree.

Here, the superior court found that trial counsel knew about the recording of Constance's conversations with trial counsel, and that the recordings were not admitted at trial. The superior court also found that trial counsel raised concerns orally about the State recording Constance's conversations with trial counsel. Constance does not explain which motions trial counsel should have filed. Nor does Constance explain how the failure to make those motions caused him prejudice. Thus, Constance has not demonstrated that he suffered prejudice from his trial counsel's failure to file motions on this matter, and has failed to meet his burden of demonstrating ineffective assistance of counsel.

## IV. CUMULATIVE ERROR

Constance argues that we should overturn this case for cumulative error. We disagree.

Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of trial errors effectively denies the defendant his or her right to a fair trial, even if each error alone would be harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). But the defendant bears the burden to show multiple trial errors and that the accumulated prejudice from those errors affected the outcome of his or her trial. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014). Because Constance has failed to show any prejudicial errors that affect Counts I–III, we hold that Constance has failed to meet his

burden of showing that the accumulated prejudice of multiple trial errors affected the outcome of his trial on Counts I–III.

## V. DOUBLE JEOPARDY

Constance argues that double jeopardy precludes consecutive sentences on Counts I and II. We disagree.

We review double jeopardy claims de novo. *State v. Kelley*, 168 Wn.2d 72, 76, 226 P.3d 773 (2010). Article I, section 9 of the Washington Constitution, the double jeopardy clause, guarantees that, "[n]o person shall . . . be twice put in jeopardy for the same offense." It mirrors the protections offered by the federal constitutional protection against double jeopardy. *See State v. Gocken*, 127 Wn.2d 95, 107, 896 P.2d 1267 (1995). "Double jeopardy principles protect a defendant from being convicted more than once under the same statute if the defendant commits only one unit of the crime." *State v. Westling*, 145 Wn.2d 607, 610, 40 P.3d 669 (2002). Former RCW 9A.28.030(1) defines criminal solicitation in Washington:

> A person is guilty of criminal solicitation when, with intent to promote or facilitate the commission of a crime, he offers to give or gives money or other thing of value to another to engage in specific conduct which would constitute such crime or which would establish complicity of such other person in its commission or attempted commission had such crime been attempted or committed.

In the case of criminal solicitation, the "unit" of crime is a defendant's act of "enticement" regardless of the number of people that a single act of enticement entices, or the number of victims the defendant enticed people to harm. *State v. Jensen*, 164 Wn.2d 943, 954-55, 957-58, 195 P.3d 512 (2008).

39

Here, Constance was convicted of Count I for soliciting Michael to commit murder, and on Count II for soliciting Jordan to commit murder. The superior court found that Constance repeatedly solicited Jordan and repeatedly solicited Michael. The superior court also found that Michael and Jordan were separately enticed to commit the crime, in exchange for a cash payment to each of them. Thus, Counts I and II do not constitute a single act of enticement. The findings support the superior court's conclusion that sentencing Constance for two separate offenses did not violate double jeopardy.[19]

## STATEMENT OF ADDITIONAL GROUNDS

Constance filed a SAG. A SAG must adequately inform us of the nature and occurrence of alleged errors. *State v. Calvin*, 171 Wn. App. 1, 26, 316 P.3d 496 (2013). We consider only arguments that we have not already adequately addressed as raised by the defendant's appellate counsel. *State v. Thompson*, 169 Wn. App. 436, 493, 290 P.3d 996 (2012), *review denied*, 176 Wn.2d 1023 (2013). Issues involving facts outside of the record are properly raised in a personal restraint petition, rather than a SAG. *Calvin*, 171 Wn. App. at 26-27. And we are "not obligated to search the record in support of claims made in a [SAG]." RAP 10.10(c).

---

[19] In his opening brief, Constance assigns error to only his consecutive sentences for Counts I and II. For the first time in his reply brief, Constance argues that the superior court erred by failing to enter a "separate acts" jury instruction. Reply Br. of Appellant at 15. We do not consider issues raised for the first time in a reply brief. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

## I. ADDITIONAL ALLEGATIONS OF *BRADY* VIOLATIONS

A.   *Speculative or Preliminary Information: Information that Jordan Impersonated a Member of the Grant County Sheriff's Office*

Constance asserts that the State violated *Brady* by failing to disclose an allegation within the police report of Jordan's violation of a restraining order that Jordan falsely claimed to be a member of the Grant County Sheriff's Office. We disagree.

The information was an allegation in a police report, from which no conviction or investigation into impersonating a member of the Grant County Sheriff's Office took place. This is speculative or preliminary information, which *Brady* does not require the State to disclose. Thus, no *Brady* violation occurred.

B.   *No Prejudice*

1. *Koncos's Police Complaint Report/Jordan's Statements*

Constance asserts that the State violated *Brady* by failing to disclose the portion of Koncos's police complaint report containing Jordan's statement. We disagree.

The superior court found that the information in this report was provided to trial counsel from other sources, and was cumulative. As we discussed above, this information would not have invalidated the Detective Acee or Detective O'Mara affidavits under *Franks*. There is no reasonable probability that the result of the proceeding would have been different if the State had disclosed the evidence to trial counsel, and thus, Constance was not prejudiced.

2. *Michael's and Jordan's E-mails*

Constance asserts that the State violated *Brady* by failing to disclose Michael's and Jordan's e-mails. We disagree.

41

The superior court found that trial counsel was aware of the contents of Michael's and Jordan's e-mails from other sources, and that the information within these e-mails was presented to the jury through other evidence. There is no reasonable probability that the result of the proceeding would have been different had the State disclosed the evidence to trial counsel, and thus, Constance was not prejudiced.

3. *Molestation Conviction of Michael's Son*

Constance asserts that the State violated *Brady* by failing to disclose evidence of the molestation conviction and sentence of Michael's son Craig. We disagree.

Under ER 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Here, the superior court found that the State did not discuss the sentence or prison conditions of Craig's sentence with Michael or Jordan, and did not imply that a failure to cooperate by Michael or Jordan would affect Craig's sentence or prison conditions. Thus, the evidence of Craig's conviction and sentence has little to no probative value. Conversely, admission of this evidence would associate Michael and Jordan with a sex offense that they did not commit, presenting a great danger of unfair prejudice.

The superior court would not have admitted the evidence of Craig's conviction and sentence under ER 403 because its minimal probative value is substantially outweighed by the danger of unfair prejudice. Thus, no prejudice exists because there is no reasonable probability

42

that the result of the proceeding would have been different had the State disclosed the evidence

of Craig's conviction and sentence to trial counsel.

### 4. *Eisele and Jones's Allegations Against Michael*

Constance asserts that the State violated *Brady* by failing to disclose Eisele and Jones's

allegations against Michael. We disagree.

Eisele would have testified that Michael committed sexual misconduct, and that Michael

never told Eisele about Constance soliciting him to kill Koncos. Jones would have testified that

Michael was a liar and violent towards women. These allegations did not lead to any charges

against Michael.

We hold that Eisele's testimony that Michael committed sexual misconduct, and Jones's

testimony that Michael was a liar and violent towards women, would have been inadmissible

under ER 608. We further hold that while Michael not telling Eisele that Constance solicited

him to kill Koncos could have been admissible, there is no reasonable probability that the result

of the proceeding would have differed had the State disclosed this evidence to trial counsel.

Thus, Constance was not prejudiced.

### 5. *Disclosure of "Mechanics" of Work Crew Duty Deal with Castellanos*

Constance asserts that despite the State disclosing its work crew duty deal with

Castellanos, and trial counsel using that deal to impeach Castellanos at trial, the State violated

*Brady* by failing to disclose the "*mechanics*" of how the State honored its deal with Castellanos

including:

> 1. Numerous communications between Detective O'Mara and Castellanos where Castellanos asked for help with the work release deal, and Detective O'Mara said he would try to help Castellanos.

2. Castellanos's pro se attempts to get his work crew duty waived.

3. The State's personal visit to the court's chambers regarding waiver of Castellanos's work crew duty.

SAG at 25 (10); *see also* Br. of Appellant at 6. We disagree.

The State disclosed the work crew duty deal with Castellanos to trial counsel, and trial counsel used this information to impeach Castellanos. The mechanics of how the State honored that deal had no additional impeachment value. There is no reasonable probability that the result of the proceeding would have differed had the State disclosed these mechanics to trial counsel, and thus, Constance was not prejudiced.

6. *The State's Assistance to Castellanos as Victim of Assault*

Constance asserts that the State violated *Brady* by failing to disclose its assistance to Castellanos after Castellanos was the victim of Castellanos's girl friend's assault. We disagree.

The superior court found that "Castellanos did not receive assistance with his complaints [as a victim of the assault] because of his status as a witness in the Constance case." CP at 4005. Because the State's assistance to Castellanos was not related to his testimony in Constance's trial, this evidence would not have been admissible. There is no reasonable probability that the result of the proceeding would have differed had the State disclosed this evidence to trial counsel, and thus, Constance was not prejudiced.

7. *Castellanos's Status as a Potential Theft Suspect*

Constance asserts that the State violated *Brady* by failing to disclose information within a police report that Castellanos was being investigated as a potential suspect of a burglary and theft at the time of his cooperation with Constance. We disagree.

The superior court found that the State did not tell Castellanos that he was being investigated, and Castellanos had no knowledge of the investigation until the evidentiary hearing on Constance's second CrR 7.8 motion. These findings support that Castellanos's possible involvement as a suspect in a burglary was a collateral matter, and that extrinsic evidence of the crime would not have been admitted. The finding that Castellanos did not know about the investigation at the time of trial supports the conclusion that trial counsel would not have been able to use the evidence to cross-examine Castellanos on this subject at trial without also admitting extrinsic evidence. There is no reasonable probability that the result of the proceeding would have differed had the State disclosed this evidence to trial counsel, and, thus, Constance was not prejudiced.[20]

8. *Prevention of Issuance of Bench Warrant*

Constance asserts that the State violated *Brady* by failing to disclose that the State prevented the issuance of the bench warrant for Castellanos. We disagree.

The superior court found that Castellanos had no knowledge of the bench warrant or of the State's action to prevent its issuance. The superior court found that there was no evidence of any implicit or explicit deals between the State and Castellanos concerning preventing the warrant's issuance. Thus, there is no reasonable probability that the result of the proceeding would have been different if the State had disclosed the prevention of the bench warrant's issuance to trial counsel and Constance was not prejudiced.

---

[20] In addition, we note that this information appears to be preliminary or speculative such that *Brady* does not require disclosure. *See Diaz*, 922 F.2d at 1006.

9. *Castellanos's Civil Suits Against the Jail*

Constance asserts that Castellanos's civil suits against the jail should have been disclosed to trial counsel because it would show Castellanos's hatred of incarceration. We disagree.

First, Castellanos's civil suits were public records and, thus, were not suppressed by the State. Second, Castellanos's civil suits have no relation to Constance's case. Constance's argument is that this information could have been used to show that Castellanos hated being incarcerated, a fact that any reasonable jury would assume. Thus, the findings support that there is no reasonable probability that the result of the proceeding would have been different if the State had disclosed this evidence to trial counsel, and no *Brady* violation occurred.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

A.    *Failure To Interview Koncos Earlier*

Constance asserts that his trial counsel provided ineffective assistance by failing to interview Koncos earlier than five days before trial. We disagree.

Assuming without deciding that trial counsel did not interview Koncos earlier than five days before trial, Constance provides no argument as to why interviewing a victim five days before trial falls below an objective standard of reasonableness, particularly in a case of criminal solicitation to murder where the victim's testimony was not nearly as important as the four witnesses who Constance solicited. Thus, Constance has failed to meet his burden of proving that trial counsel was deficient for failing to interview Koncos earlier than he did. Therefore, the superior court's findings support the conclusion that Constance has failed to meet his burden of demonstrating ineffective assistance of counsel.

46

B.     *Failure To Request E-mails from the State*

Constance asserts that trial counsel provided ineffective assistance by failing to request Michael's and Jordan's e-mails. We disagree.

As discussed above, there is no reasonable probability that the result of this proceeding would have been different if the State had disclosed Michael's and Jordan's e-mails to trial counsel. Thus, Constance cannot demonstrate prejudice. Therefore, the superior court's findings support the conclusion that Constance has failed to meet his burden of demonstrating ineffective assistance of counsel.

C.     *Failure To Investigate*

In his SAG, Constance asserts that trial counsel provided ineffective assistance by failing to properly investigate his case. We disagree.

The superior court found that trial counsel hired an investigator who conducted background checks on witnesses and assisted with interviews. Trial counsel spoke with Constance many times prior to trial. Constance does not assert that trial counsel's actual performance fell below an objective standard of reasonableness, but rather merely lists evidence that trial counsel did not discover. Thus, Constance failed to meet his burden to show trial counsel's investigation was deficient. Therefore, the superior court's findings support the conclusion that Constance has failed to meet his burden of demonstrating ineffective assistance of counsel.

IV. FAILURE TO SHOW CAUSE

Constance asserts that because the State only denied Constance's allegations, rather than addressing the substance of Constance's arguments, the State failed to "show cause" at the initial show cause hearing on his first CrR 7.8 motion. *See* CrR 7.8(c)(3). We disagree.

CrR 7.8(c)(3) states in part:

*Order to Show Cause.* . . . [the superior court] shall enter an order fixing a time and place for hearing and directing the adverse party to appear and show cause why the relief asked for should not be granted.

Here, the State argued that Constance had failed to give cause for an evidentiary hearing on his first CrR 7.8 motion. By denying that Constance had made a claim, the State showed cause why relief should not be granted.

V. JUDICIAL BIAS

Constance asserts that the superior court judge was biased against him, and requests a venue change for this reason. We deny this request.

The party who argues that a judge has a bias must support the claim with evidence. *State v. Post*, 118 Wn.2d 596, 619 n.9, 826 P.2d 172 (1992); *State v. Carter*, 77 Wn. App. 8, 11-12, 888 P.2d 1230 (1995). The defendant must show such evidence of a judge's actual or potential bias before we will apply the appearance of fairness doctrine. *Post*, 118 Wn.2d at 619 n.9; *Carter*, 77 Wn. App. at 11-12.

Here, Constance does not provide any factual allegations as to the judge's alleged bias. Rather, Constance's allegations of bias are simply a listing of decisions of the judge to which Constance disagrees. These decisions by the judge do not show a source of bias against Constance, but rather show legal determinations against Constance's interests. Thus, Constance

has failed to meet his burden of providing evidence of the judge's actual or potential bias, and we deny Constance's request for a venue change.

## V. DISCOVERY/PUBLIC RECORDS ACT VIOLATIONS

Constance asserts that the State committed widespread discovery violations and violated the Public Records Act because of "likely political motivations." SAG at 33. But Constance does not specifically explain what acts of the State constituted discovery violations or violations of the Public Records Act. Thus, Constance did not disclose the nature and occurrence of the alleged errors, and we do not consider them. RAP 10.10.

## VI. DESTRUCTION OF EVIDENCE

In his *supplementary* SAG, Constance alleges that the State, after trial, failed to preserve the CD of Jordan's voice messages, and that he had not discovered this until February 14, 2014. This issue concerns matters outside of the record on appeal, namely the recording and its current location. Thus, we cannot consider this issue. If the recording is necessary for the retrial on Count IV, the preservation of the recording should be addressed by the superior court on remand.

## VII. OTHER POTENTIAL SAG ISSUES

The remainder of Constance's issues in his SAG either fail to adequately inform us of the nature and occurrence of alleged errors, or were already adequately addressed by Constance's appellate counsel. We do not consider these arguments further.[21]

---

[21] Constance requests that we set a reasonable bail at his new trial. Because setting a defendant's bail amount is a matter for the superior court, we deny Constance's request. *See* CrR 3.2.

No. 40504-1-II
Consolidated with Nos. 43974-3-II; 44150-1-II

## CONCLUSION

In summary, we affirm both the superior court's order denying Constance's first CrR 7.8

motion, and the superior court's order partially granting Constance's second CrR 7.8 motion.

Consistent with that order, we remand for a retrial on Count IV, criminal solicitation to commit

second degree assault. We reject Constance's SAG claims.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

Worswick, P.J.

We concur:

Maxa, J.

Lee, J.